111 P.3d 844 (2005)
154 Wash.2d 291
STATE of Washington, Respondent,
v.
Adrian Martell DAVIS, Appellant.
No. 73893-9.
Supreme Court of Washington, En Banc.
Argued September 14, 2004.
Decided May 12, 2005.
As Amended May 31, 2005.
*846 Washington Appellate Project, Nancy Collins, Jason Saunders, Seattle, for Appellant.
Norm Maleng, King County Prosecutor, Julie Cook, Deputy, James Whisman, Deputy, Seattle, for Respondent.
Suzanne Lee Elliott, Jeffrey L. Fisher, Scott Carter-Eldred, Seattle, for Amicus Curiae Wash. Ass'n of Criminal Defense Attorneys.
IRELAND, J.[*]
¶ 1 This case requires us to determine whether the admission of a 911 call violated the defendant's Sixth Amendment right to confrontation under the United States Supreme Court's recent decision in Crawford v. Washington, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004). We hold that emergency 911 calls should be assessed on a case by-case basis and that the statements made should be individually evaluated for admissibility in light of the confrontation clause. We hold that overwhelming untainted evidence supports Adrian Davis's conviction and that any error in admitting "testimonial" statements without cross-examination was harmless beyond a reasonable doubt.
¶ 2 The defendant also claims that the jury instructions were fatally flawed because the element that raises the crime of domestic violence violation of a court order from a misdemeanor to a felony was not included in the "to convict" instruction, but rather was placed in a special interrogatory. We hold that such bifurcation is constitutionally permissible where the legislature has created a statutory framework that establishes a base crime and provides for elevated penalties upon proof of an additional fact as determined by a unanimous jury. We therefore affirm the Court of Appeals.

FACTS
¶ 3 On February 1, 2001, Michelle McCottry called 911. McCottry hung up before speaking to anyone. The 911 operator called McCottry back and asked her what was happening. McCottry was hysterical and crying as she responded, "He's here jumpin' on me again." Ex. 2 (911 audiotape). The 911 operator asked who McCottry was referring to, what his relationship to her was, and whether he had been drinking. McCottry identified her assailant as Adrian Davis. She told the operator that Davis had used his fists to beat her and that he had left the residence moments earlier. McCottry indicated *847 that she had a protective order against Davis.
¶ 4 Police officers Mark Jones and Steve Tamanaha responded within four minutes of McCottry's call to 911. They noted that McCottry was still very upset and had what appeared to be fresh injuries on her forearm and her face. The officers observed McCottry's frantic efforts to gather her belongings and her children so that they could leave the residence.
¶ 5 Davis was charged with one count of felony violation of the provisions of a domestic no-contact order under RCW 26.50.110(1), (4). The State's only witnesses were the two police officers who responded to the 911 call. Both officers testified that McCottry exhibited injuries that appeared to be recent, but neither officer could testify as to the cause of the injuries. A certified copy of the no-contact order was admitted into evidence.
¶ 6 McCottry did not testify. Although she initially cooperated with the prosecutor's office, the State was unable to locate McCottry at the time of trial. The only evidence linking Davis to her injuries was the tape recording of the 911 call.[1] The defense argued that admission of the 911 tape would violate Davis's right of confrontation, but the court admitted the tape under the excited utterance exception to the hearsay rule. At trial, the court denied the request of Davis's counsel for a missing witness instruction concerning McCottry.
¶ 7 The "to convict" instruction told the jury to convict Davis of domestic violence violation of a court order if the State proved each of the following elements beyond a reasonable doubt:
(1) That on or about February 1, 2001 the defendant willfully had contact with Michelle McCottry;
(2) That such contact was prohibited by a no-contact order;
(3) That the defendant knew of the existence of the no-contact order;
(4) That the acts occurred in the County of King.
Clerk's Papers at 21 (Instruction 9).
¶ 8 Instruction 12 directed the jurors to use the special verdict form only if they found the defendant guilty of the crime of violation of a no-contact order. The special verdict form asked if Davis's conduct that constituted a violation of the no-contact order was an assault. In order to answer the special verdict form in the affirmative, the jury was instructed to be unanimously satisfied beyond a reasonable doubt that "yes" was the correct answer. These instructions followed the Washington Pattern Jury Instructions. See 11 Washington Pattern Jury Instructions: Criminal 36.51, 36.54-36.55 at 182-83, 187-89 (2d ed. Supp.1998) (WPIC).
¶ 9 Davis did not object to the jury instructions, but he did take exception to the court's refusal to give his proposed missing witness instruction. The jury rendered a general verdict of guilty and answered "yes" to the special verdict form.
¶ 10 On appeal, the Court of Appeals rejected Davis's confrontation clause argument. Relying on Ohio v. Roberts, 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980), the Court of Appeals held that the trial court properly classified the 911 call as an excited utterance, which is a firmly rooted exception to the hearsay rule and thus satisfies the requirements of reliability. The court also rejected Davis's arguments that the trial court erred in refusing the missing witness instruction and in placing the assault element in a special interrogatory rather than placing it in the "to convict" instruction. State v. Davis, 116 Wash.App. 81, 64 P.3d 661 (2003).
¶ 11 This court granted review and initially consolidated the case with State v. Mills, 154 Wash.2d 1, 109 P.3d 415 (2005), No. 73894-7 (Wash. Apr. 28, 2003), because the primary issue in each case was the propriety of the "to convict" jury instruction. The cases were argued on November 19, 2003.
¶ 12 Before this court issued an opinion in this case and the Mills case, the United States Supreme Court issued its opinion in Crawford, which altered confrontation *848 clause analysis. The Crawford court held that an out-of-court "testimonial statement" of a witness is inadmissible unless the witness is unavailable and the defendant has had a prior opportunity to cross-examine him or her. On April 30, 2004, Davis filed a motion for oral argument in light of Crawford. The State also requested oral argument.
¶ 13 We granted the parties' requests for additional briefing and argument on the issues raised by Crawford. After rehearing, we deconsolidated the Davis and Mills cases and treated them as companion cases, issuing a separate opinion in each case.

ISSUES
¶ 14 1. Did the trial court err in admitting Michelle McCottry's conversation with the 911 operator?
¶ 15 2. Did the trial court err in placing the element that raises the crime from a misdemeanor to a felony in a special verdict form rather than in the "to convict" instruction?

ANALYSIS

Confrontation Clause
¶ 16 The Sixth Amendment confrontation clause provides: In all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him. U.S. Const. amend. VI. The Roberts court determined that the confrontation clause does not bar for the statement of an unavailable witness against a criminal defendant if the statement bears "adequate `indicia of reliability.'" 448 U.S. at 66, 100 S.Ct. 2531). Under Roberts, adequate reliability could be inferred when the statement either (1) falls within a firmly rooted hearsay exception or (2) contains particularized guaranties of trustworthiness. Id.
¶ 17 In Crawford, the Supreme Court overturned the Roberts' rule that an out-of-court statement was admissible as evidence without confrontation as long as it fell within a firmly rooted hearsay exception or carried other indicia of trustworthiness and reliability, stating that the "[Roberts'] framework is so unpredictable that it fails to provide meaningful protection from even core confrontation violations." 541 U.S. at 63, 124 S.Ct. 1354.
¶ 18 The Crawford court began by examining the historical background of the confrontation clause:
The common-law tradition is one of live testimony in court subject to adversarial testing, while the civil law condones examination in private by judicial officers.
Nonetheless, England at times adopted elements of the civil-law practice. Justices of the peace or other officials examined suspects and witnesses before trial. These examinations were sometimes read in court in lieu of live testimony....
Id. at 43, 124 S.Ct. 1354 (citation omitted).
¶ 19 From its examination of the history of the confrontation clause, the Court gleaned two overriding principles: (1) the primary purpose of the confrontation clause was preventing the civil law mode of criminal procedure, particularly the use of ex parte examinations as evidence against the accused; and (2) the Framers would not have allowed the admission of the testimonial statements of a witness who did not appear at trial unless he or she was unavailable to testify and the defendant had a prior opportunity for cross-examination. Id. at 47-48, 53-54, 124 S.Ct. 1354.
¶ 20 The Court declined to spell out a comprehensive definition of "testimonial." But it did give several examples of the types of statements at the core of the definition, including prior testimony at a preliminary hearing, before a grand jury or at a former trial, and police interrogations. "These are the modern practices with closest kinship to the abuses at which the Confrontation Clause was directed." Id. at 68, 124 S.Ct. 1354.
¶ 21 The Court also explained that "testimony," is typically defined as "`[a] solemn declaration or affirmation made for the purpose of establishing or proving some fact.'" Id. at 51, 124 S.Ct. 1354 (quoting 1 Noah Webster, An American Dictionary of the English Language (1828)). "An accuser who makes a formal statement to government *849 officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not." Id. The text of the Sixth Amendment and the history underlying the common-law right of confrontation reflect "an especially acute concern with a specific type of out-of-court statement." Id.
¶ 22 In the Crawford case, Michael Crawford was charged with assault and attempted murder. Id. at 40, 124 S.Ct. 1354. After his wife, Sylvia, was given Miranda[2] warnings, she was questioned. Id. "Sylvia Crawford made her statement while in police custody, herself a potential suspect in the case.... In response to often leading questions from police detectives, she implicated her husband in [the] stabbing and at least arguably undermined his self-defense claim." Id. at 65, 124 S.Ct. 1354. She did not testify at trial because of the marital privilege. Id. at 38, 124 S.Ct. 1354. Instead, a tape recording of her statement was played to the jury at the defendant's trial. Id. at 40, 124 S.Ct. 1354. The Supreme Court held that Sylvia's recorded statement was testimonial and thus inadmissible because it had not been subject to cross-examination.
¶ 23 A statement may be testimonial by virtue of the manner or mode of its making. For example, Sylvia Crawford's in-custody, tape-recorded statement taken by police officers was deemed "testimonial under even a narrow standard." Id. at 52, 124 S.Ct. 1354. Police interrogations are very similar to examinations by justices of the peace, who had essentially investigative and prosecutorial functions. Interrogations by law enforcement officers fall squarely within the classification of testimonial statements. Id. at 53, 124 S.Ct. 1354.
¶ 24 On the other hand, Crawford allows that "not all hearsay implicates the Sixth Amendment's core concerns." Id. at 51, 124 S.Ct. 1354. An offhand, overheard remark, although perhaps objectionable under hearsay rules, "bears little resemblance to the civil-law abuses the Confrontation Clause targeted." Id. Further, even testimonial statements may be admitted if offered for purposes other than to prove the truth of the matter asserted. Id. at 60 n. 9, 124 S.Ct. 1354.
¶ 25 The primary issue in the present case is whether McCottry's 911 call constitutes a "testimonial" statement under the Crawford analysis. The context of a 911 call presents a more complex scenario than the in-custody, Miranda-warned interrogation by police officers at issue in Crawford. Sylvia Crawford's statement was given during a custodial examination, which the Crawford court indicated fell within even a narrow definition of testimonial.
¶ 26 Generally, an emergency 911 call is not of the same nature as an in-custody interrogation by police. Such an emergency call is not the functional equivalent of uncross-examined, in-court testimony. Even though a call to 911 involves personnel associated with the police, the 911 operator is not a police officer. Moreover, the purpose of the call is generally not to "bear witness." The call must be scrutinized to determine whether it is a call for help to be rescued from peril or is generated by a desire to bear witness.
¶ 27 A 911 call is typically initiated by the victim, not the police. Even though an emergency 911 call may assist police in investigation or assist the State in prosecution, where the call is not undertaken for those purposes, it does not resemble the specific type of out-of-court statement with which the Sixth Amendment is concerned.
¶ 28 In People v. Corella, 122 Cal.App.4th 461, 18 Cal.Rptr.3d 770 (2004), the court held that admission of a 911 call did not violate the defendant's right to confrontation, and his conviction for corporal injury to his spouse was affirmed. The Corella court determined that the statements made to the 911 operator were not "`knowingly given in response to structured police questioning'" and did not have the formal and official quality of the statements deemed testimonial by Crawford. 18 Cal.Rptr.3d at 776 (quoting Crawford, 541 U.S. at 53 n. 4, 124 S.Ct. 1354).
¶ 29 The Corella court further stated that it is difficult to perceive any circumstances *850 under which a statement qualifying as an excited utterance would be testimonial. Id. The rationale behind the excited utterance exception to the hearsay rule is that the statement is "made without reflection or deliberation due to the stress of excitement." Id. "[S]tatements made without reflection or deliberation are not made in contemplation of their `testimonial' use in a future trial." Id. See also State v. Wright, 686 N.W.2d 295, 302 (Minn.Ct.App.2004) (victims' statements to 911 operator seeking help immediately after assault not testimonial); Beach v. State, 816 N.E.2d 57, 59 (Ind.Ct.App.2004) (victim's statement to responding police at scene after assault not testimonial); State v. Forrest, 164 N.C.App. 272, 596 S.E.2d 22, 27 (2004) (victim's statements to police upon rescue from defendant nontestimonial).
¶ 30 In most cases, one who calls 911 for emergency help is not "bearing witness," whereas calls made to the police simply to report a crime may conceivably be considered testimonial. It is necessary to look at the circumstances of the 911 call in each case to determine whether the declarant knowingly provided the functional equivalent of testimony to a government agent. See Richard D. Friedman, Adjusting to Crawford: High Court Decision Restores Confrontation Clause Protection, 19 Crim. Just., Summer 2004, at 4, 10 (whether statements made in calls to 911 operators are testimonial requires case-by-case assessment).
¶ 31 Amicus Curiae Washington Association of Criminal Defense Lawyers (WACDL) argues it is common knowledge that 911 calls may be used at subsequent trials and that McCottry reasonably knew her 911 call would later be used to prosecute Davis. Thus, McCottry's call would fit within one of the core classifications of testimonial hearsay listed in Crawford. WACDL Br. at 14 (citing Richard D. Friedman & Bridget McCormack, Dial-In Testimony, 150 U. Pa. L.Rev. 1171, 1196 (2002)). However, there is no evidence that McCottry had such knowledge or that it influenced her decision to call 911.
¶ 32 The WACDL further argues that if a 911 call involves a completed event, no matter how recent, the caller's remarks will be testimonial. But this argument fails because it focuses on the reliability traditionally accorded excited utterances under hearsay rules by virtue of their spontaneity. Crawford rejected the use of evidentiary rules and "amorphous notions of `reliability'" in assessing whether the protections of the confrontation clause have been satisfied. 541 U.S. at 61, 124 S.Ct. 1354. Crawford instructs that for purposes of Sixth Amendment confrontation, the inquiry is whether the "witness" was testifying. As the Crawford court explained, the "principal evil at which the Confrontation Clause was directed was the civil-law mode of criminal procedure, and particularly its use of ex parte examinations as evidence against the accused." 541 U.S. at 50, 124 S.Ct. 1354. McCottry's 911 call cannot accurately be described as an ex parte examination or its functional equivalent.
¶ 33 Nor is it accurate to describe the events that occurred during McCottry's call as "completed." The fact that the operator determined McCottry did not need an aid car does not necessarily mean McCottry was out of danger or that her subsequent responses were then testimonial. Her 911 call was part of an ongoing emergency situation. When the operator called McCottry back, McCottry was crying and hysterical. Only in hindsight was it known that Davis would not reappear and that the assault had ended when he left the residence.
¶ 34 Davis also contends that this call was not a typical 911 call because McCottry hung up and the 911 operator called McCottry back. But the fact that McCottry hung up does not render the phone call testimonial. On the contrary, a hang-up call often signals that the caller is in grave danger, and the 911 operator must return the call to ensure the caller's safety. It would be unwise to label 911 hang-up calls as testimonial simply because the operator must call the victim back to determine the seriousness of the situation. Rather, the circumstances and content of the call should be examined in each case.
¶ 35 Davis points to the prosecutor's closing argument where McCottry's call was described as her "testimony." Report of Proceedings (Sept. 5, 2001) at 55. According to Davis, in using the word "testimony," the *851 State essentially admitted that the 911 call was testimonial. However, the statement was made before the Crawford decision focused confrontation clause analysis on the word "testimonial." Since Crawford, "testimony" has acquired a specific meaning that should not be attributed to the State pre-Crawford.
¶ 36 An emergency 911 call may contain both statements which are nontestimonial and statements which are testimonial. In Williamson v. United States, 512 U.S. 594, 114 S.Ct. 2431, 129 L.Ed.2d 476 (1994), the Court rejected the "whole statement" approach and held that federal courts should examine proffered hearsay narrative by separating inculpatory portions from portions which are self-serving and require redaction. 512 U.S. at 603, 114 S.Ct. 2431. We adopted the Williamson holding in State v. Roberts, 142 Wash.2d 471, 494, 14 P.3d 713 (2000). The Roberts court held that erroneous admission or exclusion based upon a "whole statement" approach is subject to harmless error analysis.
¶ 37 A violation of the confrontation clause is also subject to harmless error analysis where the error was harmless beyond a reasonable doubt. Delaware v. Van Arsdall, 475 U.S. 673, 684, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986); State v. Smith, 148 Wash.2d 122, 138-39, 59 P.3d 74 (2002).
¶ 38 Under the facts of the present case, McCottry called 911 because of an immediate danger. There is no evidence McCottry sought to "bear witness" in contemplation of legal proceedings. Nonetheless, certain statements in the call could be deemed to be testimonial to the extent they were not concerned with seeking assistance and protection from peril. However, the information essential to the prosecution of this case was McCottry's initial identification of Davis as her assailant.
¶ 39 To determine whether error is harmless, this court utilizes "the `overwhelming untainted evidence' test." Smith, 148 Wash.2d at 139, 59 P.3d 74. Under that test, where the untainted evidence admitted is so overwhelming as to necessarily lead to a finding of guilt, the error is harmless. Id. (citing State v. Guloy, 104 Wash.2d 412, 426, 705 P.2d 1182 (1985)).
¶ 40 In this case, the officers arrived four minutes after McCottry's 911 call and observed and documented her fresh injuries with photographs that were introduced into evidence. The portion of McCottry's 911 call that identified Davis as her assailant was nontestimonial and properly admitted. The certified copy of the prior no-contact order was also admitted into evidence. Thus, the untainted evidence was overwhelming, and any error in admitting testimonial statements from the 911 call was harmless beyond a reasonable doubt.

Preservation of Error
¶ 41 Before addressing the adequacy of the "to convict" instruction, it is necessary to address the State's argument that Davis waived his right to challenge the "to convict" jury instruction because he did not take exception to the instruction at trial.
¶ 42 Although recognizing this court's power to review constitutional errors, the State argues the alleged error lacked the "manifest" requirement of RAP 2.5(a)(3), which permits a party to raise for the first time on appeal a "manifest error affecting a constitutional right." The Court of Appeals properly rejected this argument.
¶ 43 The State argues that Davis cannot show practical and identifiable consequences as a result of the bifurcated element. But, as we recently held in State v. Mills, 154 Wash.2d 1, 109 P.3d 415 (2005), the "to convict" instruction carries special weight because the jury relies on it as a "yardstick" by which to determine a defendant's guilt or innocence. Id. at 417. The issue of omission of an element from a "to convict" instruction is of sufficient constitutional magnitude to warrant review of a challenge to the instruction raised for the first time on appeal. Accordingly, we address the merits of Davis's challenge.

"To Convict" Jury Instruction
¶ 44 Davis argues the bifurcation from the "to convict" instruction of the assault element, which elevates his base misdemeanor *852 crime to a felony, unconstitutionally relieved the State of proving the element of assault, thereby violating his constitutional rights to due process[3] and to a jury trial.[4]
¶ 45 The State responds by asserting that the jury did find every element of the crime beyond a reasonable doubt, and that appearance of the elevating fact in a special verdict form does not deny a defendant due process, as the practice has been traditionally utilized and approved in other crimes where an elevating fact increases the statutory penalty.
¶ 46 We recently discussed this issue at length in Mills. There we held that where the legislature has established a statutory framework which defines a base crime that may be elevated to a greater crime if a certain fact is present, a trial court may, consistent with the guaranties of due process and trial by jury, bifurcate the elevating fact into a special verdict form. As long as the jury is instructed it must unanimously agree beyond a reasonable doubt before it may affirmatively answer the special verdict, the constitution is not offended.[5] Because the jury unanimously found all elements necessary to convict Davis, the instructions were sufficient here.

CONCLUSION
¶ 47 Finding that any error in admitting testimonial statements from McCottry's emergency 911 call was harmless beyond a reasonable doubt, and that there was no error in the "to convict" instruction, we affirm the Court of Appeals.
ALEXANDER, C.J., C. JOHNSON, MADSEN, BRIDGE, CHAMBERS, OWENS and FAIRHURST, JJ., concur.
SANDERS, J. (dissenting).
¶ 48 The majority is correct that every 911 call must be evaluated on a case-by-case basis to determine whether the contents are testimonial under Crawford.[1] Majority at 846, 850. The majority is also correct that logically discrete segments of the 911 call must be analyzed separately.[2] Majority at 851. However, the majority errs when it suggeststhough it does not holdthat a relevant factor is the subjective intent of the absent witness to provide information to be used in an accused's prosecution, rather than an objective evaluation of whether a reasonable person would know that their statements could be used to prosecute. The majority also errs in its evaluation of the facts of this case. Because I would hold that under the specific circumstances of this case all of Michelle McCottry's statements are testimonial, I dissent.
¶ 49 Crawford defined as the "core class of `testimonial' statements ... pretrial statements that declarants would reasonably expect to be used prosecutorially... [and] `statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial.'" Crawford, 541 U.S. at 51-52, 124 S.Ct. 1354 (emphasis added). The focus on reasonableness dictates an objective standard, evaluated *853 by whether a reasonable person would "expect [the statement] to be used prosecutorially," not a subjective determination of whether the 911 caller actually knew that his or her statement would be used prosecutorially. Yet the majority focuses on the lack of evidence that McCottry "knew" her 911 call would be used to prosecute Adrian Davis.[3]
¶ 50 The proper inquiry, as required by the United States Supreme Court's use of the terms "objective" and "reasonably," and as recognized by lower courts and leading commentators who have examined the issue, is whether a reasonable person in the 911 caller's position would know that their statement "is likely to be used in investigation or prosecution of a crime." People v. Cortes, 4 Misc.3d 575, 781 N.Y.S.2d 401, 2004 WL 1258018, *12 (citing Richard D. Friedman & Bridget McCormack, Dial-In Testimony, 150 U. PA. L.REV. 1171, 1241 (2002)).
¶ 51 The United States Court of Appeals for the Sixth Circuit stated:
The proper inquiry, then, is whether the declarant intends to bear testimony against the accused. That intent, in turn, may be determined by querying whether a reasonable person in the declarant's position would anticipate his statement being used against the accused in investigating and prosecuting the crime.
United States v. Cromer, 389 F.3d 662, 675 (6th Cir.2004).
¶ 52 Objectively, given the extensive media coverage of the use of 911 calls in the prosecution of crimes, the endless police and legal procedural dramas in which such usage plays a key role, and the nature of the questioning that occurs during the call, a reasonable person today who calls 911 in connection with a criminal act could anticipate that his or her statement would be used in investigating and prosecuting the crime.
¶ 53 Professor Richard Friedman, a leading expert on the confrontation clause whose framework for analyzing the clause was adopted by the United States Supreme Court in Crawford, stated in his seminal article on 911 calls and the Confrontation Clause: "Now consider statements made in 911 calls.... A reasonable person knows she is speaking to officialdomeither police officers or agents whose regular employment calls on them to pass information on to law enforcement, from whom it may go to the prosecutorial authorities." Friedman & McCormack, supra, at 1242.
¶ 54 Even under the circumstances of this case it is clear that a reasonable person in McCottry's position would have known that her 911 call would have resulted in Davis' prosecution and that the information relayed in the call would be used in that prosecution. As the majority notes, Davis was charged with felony violation of a no-contact order under chapter 26.50 RCW. Majority at 847. Under that chapter McCottry would have had to obtain the no-contact order, would have received a copy of that order, and would have been notified at that time of the criminal penalties for violating the order. RCW 26.50.035(1)(c); see also, e.g., State v. Powers, 124 Wash.App. 92, 97, 99 P.3d 1262 (2004).
¶ 55 Professor Friedman's most recent post-Crawford work sets forth the best reasoned structure for analyzing whether an absent witness's statement is testimonial: "Whether a statement is deemed to be testimonial ... depends on whether the statement fulfills the function of prosecution testimony. That function, in rough terms, is the transmittal of information for use in prosecution." Richard D. Friedman, Grappling with the Meaning of "Testimonial," http://wwwpersonal.umich.edu/r~dfrdma n/Grappling1.pdf at 2. It is clear that the 911 call in this case fulfilled the function of transmitting such information.
¶ 56 I agree that in some instances a 911 call that is truly only an "amplified cry for help" might not be testimonial;[4] however, *854 most 911 callsor at least the great majority of the content of most 911 callswill not fall into this category. Most 911 calls today are conducted according to a "script" composed and directed by agents for investigating authorities, as was the case here. These "scripts" constitute an interrogation just as effective as if a police officer were questioning the absent witness directly.[5] And Crawford held that interrogations by agents of the government, such as police officers, are "testimonial under even a narrow standard." Crawford, 541 U.S. at 52, 124 S.Ct. 1354.
¶ 57 As the majority notes, someone at the McCottry residence called 911. State's Ex. 2 (911 tape).[6] The 911 tape does not establish that McCottry herself made the initial call. The 911 operator then called the residence back, and McCottry answered. While McCottry was upset, the majority mischaracterizes the tape when the majority describes McCottry as "hysterical and crying." Majority at 846, 850. In fact, the first sounds heard in the call-back are not those reflected in the official transcript of the tape, but rather McCottry instructing an unknown person to "put [unintelligible] down," and a male voice responding "c'mon baby." Ex. 2.[7] It is a full 10 seconds before McCottry answers the 911 operator's "hello."
¶ 58 During that 10 seconds McCottry does not ask for help. In fact, at no time does McCottry ask for help. In response to the 911 operator's question McCottry stated that Davis had been "jumpin' on me again" and had been "usin' his fists." Ex. 2.
¶ 59 This is not the amplified "call for help" that most courts and commentators have identified as potentially "nontestimonial." McCottry's response was no different than if she had been called by the police directly and asked by an officer what had transpired, for example if a neighbor had reported a disturbance. That interrogation would clearly have been testimonial under Crawford.
¶ 60 The majority focuses on the fact that the "911 call was part of an ongoing emergency situation." Majority at 850. While this may have relevance to show that the call was potentially an "excited utterance," that inquiry is relevant to whether the call met an exception to the evidentiary rule excluding hearsay, not whether it was testimonial.[8] Certainly a witness reporting an ongoing crime is part of an "ongoing emergency *855 situation." It is nonetheless testimonial. Cortes, 4 Misc.3d at 595, 781 N.Y.S.2d 401.
¶ 61 Finally, the majority concludes that "certain statements in the call could be deemed to be testimonial to the extent they were not concerned with seeking assistance and protection from peril. However, the information essential to the prosecution of this case was McCottry's initial identification of Davis as her assailant." Majority at 851. Putting aside the fact that McCottry never "sought assistance," the majority appears to conclude that everything after the initial identification is testimonial. And presumably the majority's term "initial identification" is shorthand for both the identification and the statement that Davis had hit McCottry, since without the statement there was no proof that Davis assaulted McCottry. But the majority does not explain how the "initial identification," provided in response to structured questioning by a governmental agent, is nontestimonial.
¶ 62 It was not a "cry for help." It was a result of government-initiated interrogation. It was testimonial. Its admission violated the confrontation clause contained in the Sixth Amendment to the United States Constitution.[9] Given that there was no evidence introduced at trial other than the 911 tape which showed that Davis assaulted McCottry or violated the no-contact order, the admission of the tape was not harmless.
¶ 63 I dissent.
NOTES
[*] Justice Faith Ireland is serving as a justice pro tempore of the Supreme Court pursuant to Washington Constitution article IV, section 2(a).
[1] The tape had been redacted to remove references to a police visit to the residence two days earlier for a domestic disturbance between Davis and McCottry.
[2] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
[3] See U.S. Const. amend. XIV ("[N]or shall any state deprive any person of life, liberty, or property, without due process of law."); Wash. Const. art. I § 3 ("No person shall be deprived of life, liberty, or property, without due process of law.").
[4] See U.S. Const. art. III § 2 ("The trial of all crimes, except in cases of impeachment, shall be by jury."); U.S. Const. amend. VI ("In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury."); Wash. Const. art. I § 21 ("The right of trial by jury shall remain inviolate."); Wash. Const. art. I § 22 ("In criminal prosecutions the accused shall have the right ... to have a speedy public trial by an impartial jury.").
[5] In Mills, however, we emphasized that while such bifurcation is constitutionally permissible, it is not constitutionally required. There would have been no constitutional violation had the trial court in the case before us provided a single "to convict" instruction that included the assault element without using the special verdict approach from WPIC 36.54-36.55.
[1] Crawford v. Washington, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004).
[2] Given the majority's holding that 911 calls must be evaluated as testimonial on a case-by-case basis and that discrete portions of 911 calls must be analyzed separately to determine if they are testimonial, the majority's generalizations regarding 911 calls (majority at 849-850) are pure dicta.
[3] "However, there is no evidence that McCottry had such knowledge or that it influenced her decision to call 911." Majority at 850. "There is no evidence McCottry sought to `bear witness' in contemplation of legal proceedings." Majority at 851.
[4] See Richard D. Friedman, Adjusting to Crawford: High Court Decision Restores Confrontation Clause Protection, 19 CRIM. JUST., Summer 2004, 4, 10. Professor Friedman actually identified the Court of Appeals opinion in the case at bar as one in which the caller "is fully aware that what she says has potential evidentiary value against the alleged assailant." Id.
[5] The Valley Communications Center "Standard Operating ProceduresPolicy Number 602: Police Incident Interview Techniques" contained a series of questions that were followed almost exactly by the 911 questioner in this case. Those questions began with what transpired, where the incident occurred, when it occurred, who was involved, where the suspect went, and the circumstance which led to the incident. Br. of Wash. Ass'n of Criminal Def. Lawyers, app. at 1.
[6] The majority opinion assumes the caller was McCottry. Majority at 851. But there is no indication on the 911 tape, or in the testimony of the two officers who were the only trial witnesses, that McCottry was the caller.
[7] It is not clear that Davis is the person to whom McCottry was initially talking. During the 911 call McCottry acknowledged that, in addition to three children (Report of Proceedings (RP) at 75), there was also at least one other male in the house she had invited over ("Mike"). Ex. 2; Clerk's Papers (CP) at 2 (Certification). There were at least five persons in the house to whom McCottry might initially have been speaking. Further, according to the Certification for Determination of Probable Cause, McCottry had been arguing with the male friend "Mike" when Davis arrived. CP at 2. "Mike" and Davis drove away together in Mike's car. CP at 2. In addition, McCottry and the officers who responded to the call indicated that McCottry was in the process of moving, perhaps providing context for the instruction to put something or someone down. RP at 76. When the officers arrived, McCottry was alone in the house with the children. RP at 75. "Mike" was not identified in the police report, and was not called to testify at the trial, in spite of the fact that Mike presumably witnessed the events that took place.
[8] The United States Supreme Court in Crawford explicitly disconnected these inquiries, noting that such indicia of "reliability" are "so unpredictable that it fails to provide meaningful protection from even core confrontation violations." Crawford, 541 U.S. at 62-63, 124 S.Ct. 1354. Crawford also questioned whether "spontaneous declarations"the exception to the hearsay rule, from which the "excited utterance" doctrine was derived, see State v. Branch, 182 N.J. 338, 865 A.2d 673 (2005)which were testimonial would have been admissible in 1791. Crawford, 541 U.S. at 58 n. 8, 124 S.Ct. 1354.
[9] "In all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him." U.S. CONST. amend. VI. While the parties in this case contend only that introduction of the 911 tape violated the federal constitution, we should recall article I, section 22 of the Washington State Constitution ("In criminal prosecutions the accused shall have the right ... to meet the witnesses against him face to face.") differs significantly in text and deserves independent consideration when properly raised, as five justices of this court concluded in State v. Foster, 135 Wash.2d 441, 473, 481, 957 P.2d 712 (1998).