Justice Thomas,
concurring in the judgment in part and dissenting in part.
In Crawford v. Washington, 541 U. S. 36 (2004), we abandoned the general reliability inquiry we had long employed to judge the admissibility of hearsay evidence under the Confrontation Clause, describing that inquiry as “inherently, and therefore permanently, unpredictable.” Id., at 68, n. 10 (emphasis in original). Today, a mere two years after the Court decided Crawford, it adopts an equally unpredictable test, under which district courts are charged with divining the “primary purpose” of police interrogations. Ante, at 822. Besides being difficult for courts to apply, this test characterizes as “testimonial,” and therefore inadmissible, evidence that bears little resemblance to what we have recognized as the evidence targeted by the Confrontation Clause. Because neither of the cases before the Court today would implicate the Confrontation Clause under an appropriately targeted standard, I concur only in the judgment in Davis v. Washington, No. 05-5224, and dissent from the Court’s resolution of Hammon v. Indiana, No. 05-5705.
*835 I
A
The Confrontation Clause provides that “[i]n all criminal prosecutions, the accused shall enjoy the right... to be confronted with the witnesses against him . . . .” U. S. Const., Arndt. 6. We have recognized that the operative phrase in the Clause, “witnesses against him,” could be interpreted narrowly, to reach only those witnesses who actually testify at trial, or more broadly, to reach many or all of those whose out-of-court statements are offered at trial. Crawford, supra, at 42-43; White v. Illinois, 502 U. S. 346, 359-363 (1992) (Thomas, J., concurring in part and concurring in judgment). Because the narrowest interpretation of the Clause would conflict with both the history giving rise to the adoption of the Clause and this Court’s precedent, we have rejected such a reading. See Crawford, supra, at 50-51; White, supra, at 360 (opinion of Thomas, J.).
Rejection of the narrowest view of the Clause does not, however, require the broadest application of the Clause to exclude otherwise admissible hearsay evidence. The history surrounding the right to confrontation supports the conclusion that it was developed to target particular practices that occurred under the English bail and committal statutes passed during the reign of Queen Mary, namely, the “civil-law mode of criminal procedure, and particularly its use of ex parte examinations as evidence against the accused.” Crawford, supra, at 43, 50; White, supra, at 361-362 (opinion of Thomas, J.); Mattox v. United States, 156 U. S. 237, 242 (1895). “The predominant purpose of the [Marian committal] statute was to institute systematic questioning of the accused and the witnesses.” J. Langbein, Prosecuting Crime in the Renaissance 23 (1974) (emphasis added). The statute required an oral examination of the suspect and the accusers, transcription within two days of the examinations, and physical transmission to the judges hearing the case. *836 Id., at 10, 23. These examinations came to be used as evidence in some cases, in lieu of a personal appearance by the witness. Crawford, supra, at 43-44; 9 W. Holdsworth, A History of English Law 223-229 (1926). Many statements that would be inadmissible as a matter of hearsay law bear little resemblance to these evidentiary practices, which the Framers proposed the Confrontation Clause to prevent. See, e. g., Crawford, supra, at 51 (contrasting “[a]n off-hand, overheard remark” with the abuses targeted by the Confrontation Clause). Accordingly, it is unlikely that the Framers intended the word “witness” to be read so broadly as to include such statements. Cf. Dutton v. Evans, 400 U. S. 74, 94 (1970) (Harlan, J., concurring in result) (rejecting the “assumption that the core purpose of the Confrontation Clause of the Sixth Amendment is to prevent overly broad exceptions to the hearsay rule”).
In Crawford, we recognized that this history could be squared with the language of the Clause, giving rise to a workable, and more accurate, interpretation of the Clause. “ ‘[Witnesses,’ ” we said, are those who “ ‘bear testimony.’ ” 541 U. S., at 51 (quoting 1 N. Webster, An American Dictionary of the English Language (1828)). And “‘[tjestimony’” is “‘[a] solemn declaration or affirmation made for the purpose of establishing or proving some fact.’ ” 541 U. S., at 51 (quoting Webster, supra). Admittedly, we did not set forth a detailed framework for addressing whether a statement is “testimonial” and thus subject to the Confrontation Clause. But the plain terms of the “testimony” definition we endorsed necessarily require some degree of solemnity before a statement can be deemed “testimonial.”
This requirement of solemnity supports my view that the statements regulated by the Confrontation Clause must include “extrajudicial statements . . . contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions.” White, supra, at 365 (opinion of Thomas, J.). Affidavits, depositions, and prior testimony *837 are, by their very nature, taken through a formalized process. Likewise, confessions, when extracted by police in a formal manner, carry sufficient indicia of solemnity to constitute formalized statements and, accordingly, bear a “striking resemblance,” Crawford, supra, at 52, to the examinations of the accused and accusers under the Marian statutes.[1] See generally Langbein, supra, at 21-34.
Although the Court concedes that the early American cases invoking the right to confrontation or the Confrontation Clause itself all “clearly involve[d] testimony” as defined in Crawford, ante, at 824, it fails to acknowledge that all of the cases it cites fall within the narrower category of formalized testimonial materials I have proposed. See ante, at 824, n. 3.[2] Interactions between the police and an accused (or witnesses) resemble Marian proceedings — and these early cases — only when the interactions are somehow rendered “formal.” In Crawford, for example, the interrogation was custodial, taken after warnings given pursuant to Miranda v. Arizona, 384 U. S. 436 (1966). 541 U. S., at 38. Miranda warnings, by their terms, inform a prospective de *838 fendant that “ ‘anything he says can be used against him in a court of law.”’ Dickerson v. United States, 530 U. S. 428, 435 (2000) (quoting Miranda, supra, at 479). This imports a solemnity to the process that is not present in a mere conversation between a witness or suspect and a police officer.[3]
The Court all but concedes that no case can be cited for its conclusion that the Confrontation Clause also applies to informal police questioning under certain circumstances. Ante, at 824-826. Instead, the sole basis for the Court’s conclusion is its apprehension that the Confrontation Clause will “readily be evaded” if it is only applicable to formalized testimonial materials. Ante, at 826. But the Court’s proposed solution to the risk of evasion is needlessly overinclusive. Because the Confrontation Clause sought to regulate prosecutorial abuse occurring through use of ex parte statements as evidence against the accused, it also reaches the use of technically informal statements when used to evade the formalized process. Cf. ibid. That is, even if the interrogation itself is not formal, the production of evidence by the prosecution at trial would resemble the abuses targeted by the Confrontation Clause if the prosecution attempted to use out-of-court statements as a means of circumventing the literal right of confrontation, see Coy v. Iowa, 487 U. S. 1012 (1988). In such a case, the Confrontation Clause could fairly be applied to exclude the hearsay statements offered by the prosecution, preventing evasion without simultaneously excluding evidence offered by the prosecution in good faith.
The Court’s standard is not only disconnected from history and unnecessary to prevent abuse; it also yields no predictable results to police officers and prosecutors attempting to comply with the law. Cf. Crawford, supra, at 68, n. 10 (criti *839 cizing unpredictability of the pre-Crawford test); White, 502 U. S., at 364-365 (Thomas, J., concurring in part and concurring in judgment) (limiting the Confrontation Clause to the discrete category of materials historically abused would “greatly simplify” application of the Clause). In many, if not most, cases where police respond to a report of a crime, whether pursuant to a 911 call from the victim or otherwise, the purposes of an interrogation, viewed from the perspective of the police, are both to respond to the emergency situation and to gather evidence. See New York v. Quarles, 467 U. S. 649, 656 (1984) (“Undoubtedly most police officers [deciding whether to give Miranda warnings in a possible emergency situation] would act out of a host of different, instinctive, and largely unverifiable motives — their own safety, the safety of others, and perhaps as well the desire to obtain incriminating evidence from the suspect”). Assigning one of these two “largely unverifiable motives,” ibid., primacy requires constructing a hierarchy of purpose that will rarely be present — and is not reliably discernible. It will inevitably be, quite simply, an exercise in fiction.
The Court’s repeated invocation of the word “objectiv[e]” to describe its test, see ante, at 822, 827, 828, 830, however, suggests that the Court may not mean to reference purpose at all, but instead to inquire into the function served by the interrogation. Certainly such a test would avoid the pitfalls that have led us repeatedly to reject tests dependent on the subjective intentions of police officers.[4] It would do so, however, at the cost of being even more disconnected from the *840 prosecutorial abuses targeted by the Confrontation Clause. Additionally, it would shift the ability to control whether a violation occurred from the police and prosecutor to the judge, whose determination as to the “primary purpose” of a particular interrogation would be unpredictable and not necessarily tethered to the actual purpose for which the police performed the interrogation.
B
Neither the 911 call at issue in Davis nor the police questioning at issue in Hammon is testimonial under the appropriate framework. Neither the call nor the questioning is itself a formalized dialogue.[5] Nor do any circumstances surrounding the taking of the statements render those statements sufficiently formal to resemble the Marian examinations; the statements were neither Mirandized nor custodial, nor accompanied by any similar indicia of formality. Finally, there is no suggestion that the prosecution attempted to offer the women’s hearsay evidence at trial in order to evade confrontation. See 829 N. E. 2d 444, 447 (Ind. 2005) (prosecution subpoenaed Amy Hammon to testify, but she was not present); 154 Wash. 2d 291, 296, 111 P. 3d 844, 847 (2005) (en banc) (State was unable to locate Michelle McCottry at the time of trial). Accordingly, the statements at issue in both cases are nontestimonial and admissible under the Confrontation Clause.
The Court’s determination that the evidence against Hammon must be excluded extends the Confrontation Clause far beyond the abuses it was intended to prevent. When combined with the Court’s holding that the evidence against Davis is perfectly admissible, however, the Court’s Hammon *841 holding also reveals the difficulty of applying the Court’s requirement that courts investigate the “primary purpose[s]” of the investigation. The Court draws a line between the two cases based on its explanation that Hammon involves “no emergency in progress,” but instead, mere questioning as “part of an investigation into possibly criminal past conduct,” ante, at 829, and its explanation that Davis involves questioning for the “primary purpose” of “enabling] police assistance to meet an ongoing emergency,” ante, at 828. But the fact that the officer in Hammon was investigating Mr. Hammon’s past conduct does not foreclose the possibility that the primary purpose of his inquiry was to assess whether Mr. Hammon constituted a continuing danger to his wife, requiring further police presence or action. It is hardly remarkable that Hammon did not act abusively toward his wife in the presence of the officers, ante, at 829-830, and his good judgment to refrain from criminal behavior in the presence of police sheds little, if any, light on whether his violence would have resumed had the police left without further questioning, transforming what the Court dismisses as “past conduct” back into an “ongoing emergency,” ante, at 828, 829.[6] Nor does the mere fact that McCottry needed emergency aid shed light on whether the “primary purpose” of gathering, for example, the name of her assailant was to protect the police, to protect the victim, or to gather information for prosecution. In both of the. cases before the Court, like many similar cases, pronouncement of the “pri *842 mary” motive behind the interrogation calls for nothing more than a guess by courts.
II
Because the standard adopted by the Court today is neither workable nor a targeted attempt to reach the abuses forbidden by the Clause, I concur only in the judgment in Davis v. Washington, No. 05-5224, and respectfully dissent from the Court’s resolution of Hammon v. Indiana, No. 05-5705.

 Like the Court, I presume the acts of the 911 operator to be the acts of the police. Ante, at 823, n. 2. Accordingly, I refer to both the operator in Davis and the officer in Hammon, and their counterparts in similar cases, collectively as “the police.”

 Our more recent cases, too, nearly all hold excludable under the Confrontation Clause materials that are plainly highly formal. See White v. Illinois, 502 U. S. 346, 365, n. 2 (1992) (Thomas, J., concurring in part and concurring in judgment). The only exceptions involve confessions of codefendants to police, and those confessions appear to have either been formal due to their occurrence in custody or to have been formalized into signed documents. See Douglas v. Alabama, 380 U. S. 415, 416 (1965) (signed confession); Brookhart v. Janis, 384 U. S. 1 (1966) (signed confession taken after accomplice’s arrest, see Brief for Petitioner in Brookhart v. Janis, O. T. 1965, No. 657, pp. 10-11); Bruton v. United States, 391 U. S. 123, 124 (1968) (custodial interrogation); Roberts v. Russell, 392 U. S. 293 (1968) (per curiam) (custodial interrogation following a warning that the eodefendant’s statement could be used against her at trial, see Brief in Opposition in Roberts v. Russell, O. T. 1967, No. 920, pp. 5-6).

 The possibility that an oral declaration of past fact to a police officer, if false, could result in legal consequences to the speaker, see ante, at 826-827, may render honesty in casual conversations with police officers important. It does not, however, render those conversations solemn or formal in the ordinary meanings of those terms.

 See New York v. Quarles, 467 U. S. 649, 655-656, and n. 6 (1984) (subjective motivation of officer not relevant in considering whether the public safety exception to Miranda v. Arizona, 384 U. S. 436 (1966), is applicable); Rhode Island v. Innis, 446 U. S. 291, 301 (1980) (subjective intent of police officer to obtain incriminatory statement not relevant to whether an interrogation has occurred); Whren v. United States, 517 U. S. 806, 813 (1996) (refusing to evaluate Fourth Amendment reasonableness in light of the officers’ actual motivations).

 Although the police questioning in Hammon was ultimately reduced to an affidavit, all agree that the affidavit is inadmissible per se under our definition of the term “testimonial.” Brief for Respondent in No. 05-5705, p. 46; Brief for United States as Amicus Curiae in No. 05-5705, p. 14.

 Some of the factors on which the Court relies to determine that the police questioning in Hammon was testimonial apply equally in Davis. For example, while Hammon was “actively separated from the [victim]” and thereby “prevented... from participating in the interrogation,” Davis was apart from McCottry while she was questioned by the 911 operator and thus unable to participate in the questioning. Ante, at 818, 830. Similarly, “the events described [by McCottry] were over” by the time she recounted them to the 911 operator. Ante, at 830. See 154 Wash. 2d 291, 295-296, 111 P. 3d 844, 846-847 (2005) (en banc).