# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 54420-2-II |
| Respondent, | |
| v. | |
| ANDY WRIGHT, | UNPUBLISHED OPINION |
| Appellant. | |

GLASGOW, J.—Andy Wright's family had a close friendship with the T family when the Wrights lived in Washington. The three sons of the T family were friends with Wright's son and frequently spent the night at Wright's home. A few years after the Wrights moved from Washington to California, the middle T son, CT, disclosed to his parents that Wright had touched him inappropriately many times over the years. The other two sons, DT and HT, also disclosed that Wright had sexually abused them.

Following a jury trial, Wright was convicted of first degree child rape, second degree child rape, two counts of first degree child molestation, second degree child molestation, and third degree child molestation, with abuse of trust and pattern of abuse enhancements on each count. Wright appeals his convictions, arguing that the trial court violated his right to present a defense by restricting Wright's ability to question the T parents about their first reaction to CT's initial disclosure. Wright sought to elicit testimony that the T parents each initially asked themselves if CT was fabricating the allegations to get out of trouble for smoking marijuana. In a statement of

additional grounds for review, Wright also argues that the trial court violated his due process and confrontation rights and that the State improperly withheld exculpatory evidence. We disagree with all of Wright's claims and affirm his convictions.

FACTS

I. BACKGROUND

In 2008, DT, who was 11 years old at the time, became friends with Wright's son who lived in the same neighborhood. Over time, the T family, including DT's two younger brothers, CT and HT, started spending time with the Wright family. The families became close, spending holidays, birthdays, and vacations together. Eventually, all three T boys began regularly spending the night at the Wrights' home. They would typically set up an air mattress in the living room where the boys and Wright would watch television and play video games late into the night. Wright typically slept downstairs with the boys.

In summer 2011, CT stopped spending the night at the Wrights' home. Later that year, the Wrights moved to California. The Wrights returned to Washington in 2014 and resumed their friendship with the T family before moving back to California again in 2016.

In January 2018, Christine and Douglas T were concerned that CT was using marijuana. Marijuana was not allowed in their household, and CT had been in trouble for having marijuana several times. When Douglas had a heart-to-heart with CT and asked why he felt like he needed to use marijuana, CT disclosed that Wright had sexually abused him several times over the years.

After the conversation with CT, Christine talked to DT and HT who eventually disclosed that Wright had sexually abused them too. Christine arranged for CT to begin counseling. The

counseling service referred Christine to the Washington State Child Abuse Center. The case was then referred to the Kitsap County Sheriff's Office.

## II. TRIAL

### A. Charges and Victim Testimony

The State charged Wright with first degree child rape, second degree child rape, two counts of first degree child molestation, second degree child molestation, and third degree child molestation. Each charge included special allegations that Wright abused his position of trust in the commission of the crime and that the offense was part of an ongoing pattern of sexual abuse.

DT, CT, and HT each testified at trial. Each of them testified to instances when Wright sexually abused them during the time they spent at the Wright home. DT testified that when he was around 12 or 13 years old, Wright inappropriately touched his genitals "[t]oo many [times] to count." Verbatim Report of Proceedings (VRP) (Nov. 18, 2019) at 1379. CT also testified to several instances of abuse, including instances where Wright had intercourse or attempted intercourse with CT or HT. CT further testified that he eventually disclosed these incidents with Wright after getting in trouble for smoking marijuana.

### B. Motion in Limine and Testimony Regarding Credibility

Wright moved in limine to prohibit the State from asking a witness to comment on the truthfulness or veracity of another witness. The State likewise moved to prohibit any examination inviting one witness to comment on another witness's accuracy or credibility. In a memorandum regarding the State's motion in limine, Wright argued he should be permitted to question CT's parents about how each of them initially asked themselves if CT was fabricating the allegations to get out of trouble for smoking marijuana.

During argument on the State's motion, Wright explained that he generally agreed with the motion, but intended to ask CT's parents, "'Did you have any questions about whether [CT] was telling the truth?'" VRP (Oct. 28, 2019) at 25. The State responded that the parents' initial reaction to CT's disclosure was irrelevant. The trial court ultimately granted the State's motion, explaining that under ER 608, a witness cannot testify as to whether they believe a particular statement of another witness. CT's parents therefore were not permitted to testify about whether they believed him when he initially disclosed the abuse or whether they thought he had a motive to lie. However, the trial court permitted Wright to question the parents about what was occurring at the time CT made the disclosure in terms of CT being in trouble for using marijuana and facing possible punishment.

The State called Christine to testify at trial. Before Wright began his cross-examination of Christine, the trial court reiterated its ruling regarding the motion in limine.

> I am not going to allow him to ask whether or not [Christine] believed [CT]. . . . [W]e can talk about the context of disclosure, but what her immediate thoughts were as to whether or not this was true or wasn't true, that is a comment on the credibility of the information that she received, and I have excluded that.

VRP (Nov. 14, 2019) at 1080.

The attorneys and the trial court revisited the parameters of the trial court's ruling on the motion in limine again before a sheriff's deputy who had interviewed the children, Deputy Heather Kennedy,[1] testified at trial. The trial court distinguished between testimony about the children's demeanor, for example whether they were laughing or crying, and testimony interpreting that demeanor, which could be a comment about their truthfulness or credibility.

---

[1] Formerly Kitsap County Sheriff's Detective Heather Wright.

Wright called Douglas as a defense witness at trial. Douglas testified that he had multiple conversations with CT about his marijuana use, which was not allowed in their household. Douglas began to wonder if something bigger was bothering CT:

So I had to actually have a regular, you know, heart to heart with him and ask him.

I was -- like growing up I was around this stuff. You know, I know about it. I know what it is. And I was like, "I need to know why you feel that you need it. Are you -- do you have something going on that you're running from or you need to elaborate on?" I was like, "There's only a couple of reasons why people do this. One, because they either had something tragic happen in their life or they just are experimenting." And I was like, "I don't feel it's an experimentation situation with you, son, anymore because of the number of times that we've had to have this conversation."

VRP (Nov. 19, 2019) at 1533-34.

On cross-examination, the State asked Douglas, "Had [CT] ever made any kind of -- to get out of trouble had he ever made any kind of accusations that he was forced to do it or he took some bad action because something was done to him prior to this occasion?" *Id.* at 1537-38. Douglas answered that CT had not. The State also asked if CT had ever tried to deflect and blame somebody else when he had previously been in trouble for marijuana. Douglas answered, "No." *Id.* at 1538.

Douglas testified that in previous conversations about his marijuana use, CT would "shut down" and not engage in the conversation. *Id.* at 1541. But during this conversation, CT "broke down" and "actually talked about why and what was going on." *Id.* Douglas described CT's demeanor during their conversation as "he was a little more engaged. He was actually talking with us. . . . He was actually communicating." *Id.* at 1557.

Wright argued to the trial court that by asking if CT had ever tried to deflect or blame somebody else when he previously had gotten into trouble, the State opened the door to Wright asking if Douglas believed CT was making up the sexual abuse allegations. The trial court

5

disagreed and reiterated its ruling on the motion in limine prohibiting the parties from asking a witness to comment on the truthfulness of another witness.

C.      Wright's Closing Argument

In his closing argument, Wright argued that CT accused Wright of abuse to avoid getting in trouble for using marijuana.

> [CT] is the lynchpin of when the whole thing started too, so we want to look at what happened in this case. You have [CT] who had been in trouble for a long time. He had been caught with marijuana. You had the testimony of his father and his mother that that was a significant thing. They couldn't have marijuana in the house.
>
> And so he is confronted by his father who, in the testimony, unfortunately had been molested, he said, when he was younger. I would argue that you consider that and think that he knew about that in his house and how significant it was, and his father told you that he suggested, "Is there something that's happened to you? Have you been molested?" The seed was planted at that point. The seed was planted, and he said yes.
>
> So who do you pick when that seed is planted? You pick the person that's gone, clear out in California.

VRP (Nov. 20, 2019) at 1700-01. Wright also argued that HT and DT made up their allegations to support their brother.

The jury found Wright guilty of all charges and special allegations. Wright appeals his convictions.

ANALYSIS

I. RIGHT TO PRESENT A DEFENSE

Wright argues that the trial court violated his right to present a defense by excluding CT's parents' testimony about CT's demeanor at the time he initially disclosed the abuse. We disagree.

6

To determine whether the exclusion of evidence violates a defendant's constitutional right to present a defense, we engage in a two-part analysis. *State v. Arndt*, 194 Wn.2d 784, 797-98, 453 P.3d 696 (2019). In addition to reviewing the trial court's evidentiary rulings for an abuse of discretion, we consider de novo whether those rulings deprived the defendant of their right to present a defense. *Id.* Under *Arndt*, this constitutional question must be analyzed even where there is no evidentiary error. *See id*. at 812.

We review evidentiary decisions for an abuse of discretion. *State v. Scherf*, 192 Wn.2d 350, 387, 429 P.3d 776 (2018). Evidentiary error is harmless unless the defendant shows a reasonable probability that the error materially affected the outcome of the trial. *State v. Barry*, 183 Wn.2d 297, 317-18, 352 P.3d 161 (2015).

Wright acknowledges that it is improper to ask one witness if another witness is lying. *See State v. Wright*, 76 Wn. App. 811, 888 P.2d 1214 (1995). Wright attempts to distinguish the evidence the trial court excluded here, arguing, "[D]efense counsel made it clear he would not ask the parents' opinion regarding the credibility of [CT]'s statements or testimony. . . . Instead, the defense sought to present their observations of [CT] in the context of the conversation when he first made the allegations." Br. of Appellant at 12. On appeal, Wright repeatedly characterizes the evidence he sought to elicit as evidence of CT's demeanor. This argument mischaracterizes the record and the trial court's ruling.

At trial, Wright explicitly told the trial court that he intended to ask CT's parents, "'Did you have any questions about whether [CT] was telling the truth?'" VRP (Oct. 28, 2019) at 25. This type of opinion testimony regarding the veracity of witnesses is "clearly inappropriate." *State v. Quaale*, 182 Wn.2d 191, 200, 340 P.3d 213 (2014); *see also State v. Jerrels*, 83 Wn. App. 503,

508, 925 P.2d 209 (1996) (holding that the prosecutor committed misconduct by improperly asking the mother of alleged child rape victims if she believed her children were telling the truth: "A mother's opinion as to her children's veracity could not easily be disregarded."). To the extent Wright sought to elicit testimony regarding CT's *demeanor* at the time of disclosure, the trial court's ruling on the motion in limine permitted such evidence. Initially, the trial court explained its ruling as "the circumstances surrounding the disclosure can be explored by the defense." VRP (Nov. 4, 2019) at 21. When the trial court revisited the issue before Christine's testimony, the trial court explained, "[W]e can talk about the context of disclosure." VRP (Nov. 14, 2019) at 1080. Before Deputy Kennedy testified, the trial court expressly addressed the difference between testimony about the children's demeanor and opinion about their veracity.

The trial court's ruling permitted Wright to elicit testimony about CT's demeanor during his disclosure, and it properly prohibited opinion testimony about the veracity of CT's statements. Accordingly, we hold that the trial court did not abuse its discretion by granting the motion in limine.

Wright also argues that the trial court erred by denying his request to ask Douglas whether he believed CT was deflecting when he made the initial allegations against Wright. Wright contends that the State opened the door to such questioning by asking Douglas if CT had deflected on other occasions when he was being disciplined. But the trial court's evidentiary ruling in that instance was consistent with its ruling on the motion in limine. The State's cross-examination of Douglas included questioning him about CT's prior behaviors and actions when facing discipline; such testimony fell squarely within the parameters of what the trial court ruled in limine as permissible. Asking how CT *behaved* in the past was different from asking if Douglas believed

CT was being truthful when he made these allegations. The latter improperly seeks opinion testimony regarding the veracity of a witness, and the trial court did not abuse its discretion by denying Wright's request.

Having established that there was no evidentiary error, we turn to whether the trial court's evidentiary ruling violated Wright's Sixth Amendment right to present a defense. We balance the State's interest in excluding the evidence against Wright's need to admit it. *Arndt*, 194 Wn.2d at 812. In *Arndt*, the Supreme Court held that because the defendant was able to advance her defense theory despite the trial court's evidentiary rulings, the defendant's Sixth Amendment rights were not violated. *Id*. at 814. The court distinguished this circumstance from a situation where the excluded evidence "was 'evidence of extremely high probative value; it [was the defendant's] entire defense.'" *Id*. at 813 (quoting *State v. Jones*, 168 Wn.2d 713, 721, 230 P.3d 576 (2010)).

Here, like in *Arndt*, Wright was able to advance his defense theory despite the trial court's evidentiary rulings. Wright's defense theory was that CT fabricated the allegations about Wright in order to avoid punishment for using marijuana. Although the trial court limited Wright's ability to directly ask Christine and Douglas if they believed CT was deflecting to avoid punishment, Wright remained free to, and did, elicit testimony that CT was about to face punishment for marijuana use. Douglas also testified that CT had been punished for marijuana use before and that CT's parents considered marijuana use to be a serious problem.

In closing argument, Wright emphasized his defense theory, casting CT as "the lynchpin," and noting that CT had "been in trouble for a long time," and was aware that having marijuana "was a significant thing." VRP (Nov. 20, 2019) at 1700. Wright argued, "[CT's] in trouble again. He's got himself out of that trouble. He's deflected from what's happening to him, and now his

brothers have come to, you know, help him out." *Id.* at 1705. Because the trial court did not exclude Wright's entire defense, there was no constitutional violation.

## II. STATEMENT OF ADDITIONAL GROUNDS FOR REVIEW

A.     CT's Truthfulness

Wright argues that the trial court violated his due process rights by prohibiting evidence bearing on CT's truthfulness. In particular, Wright argues that some of the events CT described could not have occurred when he testified they did because Wright did not own a travel trailer or live in Washington during the year when CT alleged abusive incidents occurred. But the trial court did not limit the introduction of such evidence. Wright could have asked CT about the timeline during his cross-examination, or otherwise introduced evidence to rebut the timeline of abuse established by CT, but he chose not to. The trial court did not violate Wright's due process rights.

B.     Right to Confrontation

Wright also argues that his confrontation clause rights were violated when Detective Mike Grant and Deputy Kennedy were not questioned about inconsistent statements DT had made in his previous interview.[2] The confrontation clause of the Sixth Amendment to the United States Constitution provides criminal defendants the right to confront the witnesses against them. *State v. Davis*, 154 Wn.2d 291, 298, 111 P.3d 844 (2005).

Nothing in the record supports Wright's claim that his right to confrontation was violated. The course of Wright's cross-examination of Detective Grant and Deputy Kennedy was a matter of trial tactics left to his defense attorney; the trial court did not restrict Wright's ability to question

---

[2] Wright refers to a video recorded interview with DT. But the record does not contain any reference to a video recorded interview with DT. Rather, Deputy Kennedy testified that the interview with DT was not video recorded.

these witnesses. At trial, Wright did not attempt to question Detective Grant or Deputy Kennedy about DT's prior statements. Wright's claim fails.

C.     Video of Interview

Wright also argues that the State violated his right to due process by failing to provide the video recorded interview between DT and detectives. However, nothing in the record suggests that any such video exists. The existence of video recorded interviews of CT and HT, created during their forensic interviews, is well established throughout the trial record. However, Deputy Kennedy testified that her interview with DT was not video recorded.

Due process requires the State to disclose material exculpatory evidence to the defense, but the State cannot disclose something that does not exist. *State v. Donahue*, 105 Wn. App. 67, 77, 18 P.3d 608 (2001). To the extent Wright contends a video recorded interview of DT exists outside of our record on appeal, Wright's claim may be better suited for a personal restraint petition. *State v. McFarland*, 127 Wn.2d 322, 335, 899 P.2d 1251 (1995).

We affirm.

No. 54420-2-II

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Glasgow, J.

We concur:

, C.J.

Lee, C.J.

Maxa, J.