176 P.3d 582 (2008)
STATE of Washington, Respondent,
v.
James Norman CLASSEN, Appellant.
No. 35240-1-II.
Court of Appeals of Washington, Division 2.
February 5, 2008.
*584 Mark W. Muenster, Attorney at Law, Vancouver, WA, for Appellant.
Michael C. Kinnie, Attorney at Law, Vancouver, WA, for Respondent.
HUNT, J.
¶ 1 James Classen appeals his conviction for first degree murder of his wife. He argues that (1) the trial court improperly limited his cross examination of State expert witness Dr. Barry Ward about a conversation Ward allegedly had with Classen's son concerning the degree of murder Ward believed was appropriate; (2) testimony about his (Classen's) pretrial behavior while in custody violated his right to a fair trial; (3) the prosecutor committed misconduct during his closing argument when he misstated the law by calling manslaughter an "accident"; and (4) the reconstructed record is insufficient for review. We affirm.

FACTS

I. Murder
¶ 2 At about two o'clock one February 2005 morning, Dr. James Classen went to the home of his estranged wife, Eveann Classen (Eveann),[1] who was sleeping. Using scissors from the sewing room, Classen stabbed Eveann an estimated 100 times.
¶ 3 Classen then drove to the family's cabin, called and told his friend Stanley Grenz that he had killed Eveann, and asked Grenz to come to the cabin. Grenz and another friend, Bruce Adams, went to the cabin, found Classen, and called 911.
¶ 4 Officers Tim Converse and David Garcia arrived at the cabin and arrested Classen for murdering Eveann. Classen told them the clothes he was wearing earlier and the scissors were at the cabin. Deputy Monty Buettner later found the scissors, clothes with reddish brown stains, and a Ziploc bag containing a stained towel on the cabin grounds.
¶ 5 Meanwhile, the sheriffs office dispatched Deputies John Horch, Chad Rothenberger, and Sergeant Steve Shea to Eveann's home. They found Eveann lying on the floor. A paramedic on the scene confirmed that she was dead. The medical examiner concluded that Eveann had died from blood loss and asphyxia sometime during the night.
¶ 6 The police transported Classen to the Skamania County jail, where he waived his Miranda[2] rights and, in a videotaped statement, confessed to having killed his wife.[3]

II. Procedure
¶ 7 The State charged Classen with first degree murder.

A. Pretrial .
¶ 8 The trial court ordered Classen admitted to Western State Hospital for a 15-day evaluation to determine his capacity to form an intent to commit first degree murder. Western State's sanity commission, which comprised psychiatrist Dr. Nitin Karnik and psychologist Dr. Barry Ward, concluded that (1) Classen suffered from major depressive disorder, (2) he had the capacity to engage in "goal-directed conduct," and (3) he could "reflect before purposeful action."
*585 ¶ 9 The State moved in limine to restrict Classen's cross examination of Dr. Ward. Classen's counsel planned (1) to cross examine Dr. Ward about a conversation he had allegedly had with Classen's son, Maurice Classen (Maurice); and (2) to present Maurice's testimony to impeach Dr. Ward. Classen's counsel told the trial court, (1) "What I believe [Ward] said to Maurice Classen runs contrary to the opinions he's gonna offer this jury, where he said he believes this is more appropriately a murder two, which in shorthand is his way of telling someone that he thinks there's grave questions about whether he had the capacity to premeditate," Report of Proceedings (RP) at 609 (emphasis added); and (2) "for [Ward] to say it's more appropriately Murder in the Second Degree is his way of saying that I believe that there's serious questions about his ability to premeditate. That's the only thing he could have meant in context." RP at 611 (emphasis added).
¶ 10 In essence, defense counsel told the trial court that he intended to offer Maurice's testimony that Dr. Ward had told him Classen should be charged with second degree murder instead of first degree murder. The State argued this hearsay opinion was inadmissible because it would invade the province of the jury. The trial court reserved ruling on the admissibility of this statement, explaining that admissibility would depend on the phrasing of the parties' questions and witnesses' answers at trial.

B. Trial

1. State's case in chief
¶ 11 In its case in chief, the State presented testimony from the arresting officers, detectives, and Clark County medical examiner Dr. Dennis Wickham. It also played Classen's videotaped confession for the jury.[4]

2. Classen's defense
¶ 12 Classen's defense was that he had been unable to form the requisite intent or to premeditate killing his wife because of his bipolar disorder. He called psychologist Dr. David Shapiro, who testified that Classen suffered from bipolar disorder and was in a dissociative state at the time of the offense. Classen also called pharmacologist Dr. Robert Julien, who testified that the anti-depressive medications Classen was taking at the time of the homicide could cause a "manic flip" in a bipolar patient, precipitating a manic state.

3. Rebuttal
¶ 13 On rebuttal, the State presented Dr. Karnik, the Western State psychiatrist who had evaluated Classen, and Dr. Ward, the Western State psychologist who had evaluated Classen with Dr. Karnik, to counter Classen's claim that he suffered from bipolar disorder and, therefore, was incapable of forming an intent to premeditate murder. Dr. Karnik testified that (1) a person suffering from bipolar disorder would typically "act out" in custody, but (2) Classen continued to take the same medications while in custody pending trial and was "doing well," Dr. Ward testified that (1) Classen showed no symptoms of bipolar disorder during his pretrial evaluation, (2) Classen's behavior over the previous 14 months in custody was an important source of collateral information for purposes of diagnosis, and (3) a person with bipolar disorder would invariably have problems in custody.
¶ 14 Outside the jury's presence, the trial court conducted a hearing to determine the admissibility of Maurice's proposed impeachment testimony. According to Classen's oral offer of proof, Dr. Ward had told Maurice that Classen should be charged with second degree murder instead of first degree murder. But Dr. Ward testified he was "certain" he did not tell Maurice that he (Ward) thought Classen should have been charged with second, rather than first degree murder.[5] RP at 842-43. Dr. Ward did acknowledge, *586 however, having discussed with Maurice the possibility of a plea bargain; and he remembered Maurice "expressing a hope that this would be murder two versus a murder one," but that he (Dr. Ward) "saw that not as a possible outcome at trial." RP at 848.
¶ 15 The trial court found that in order to admit this proffered hearsay as a prior inconsistent statement, Dr. Ward would first have to testify in front of the jury about the degree of murder he believed was appropriate for Classen. The trial court then ruled that Dr. Ward's opinion about the appropriate degree of murder would invade the jury's province. Accordingly, the trial court limited Classen's cross examination by preventing questions about Dr. Ward's alleged "seconddegree murder" statement to Maurice, thereby excluding Maurice's proposed impeachment testimony.
¶ 16 Over Classen's objection, the State concluded its rebuttal by calling three custodial officers from the Clark County Jail, where Classen had been incarcerated pending trial. The custodial officers testified that Classen had exhibited no behavioral problems during his 14 months in custody; nor did he receive infractions for even minor offenses.
4. Instructions and closing argument
¶ 17 The trial court instructed the jury on the elements of first and second degree murder and first and second manslaughter. The instruction for first degree manslaughter described the crime as "when [a person] . . . recklessly causes the death of another person." The instruction for second degree manslaughter said that "a person' commits the crime . . . when, with criminal negligence, he or she causes the death of another person . . ." Clerk's. Papers (CP) at 101, 105. During closing, the prosecutor argued:
Manslaughter instructions? Manslaughter. The defendant actually is trying to say he should be convicted only of manslaughter. Manslaughter is an accident. You look at the instructions on manslaughter it talks about acting recklessly for first degree, or negligently for second degree. Those are concepts of accident.
Where's the accident here? This is not an accident. He's not accidentally plunging the scissors in his wife's face over and over and over. This is nothing like a manslaughter, it's not even close.
RP at 951. Classen neither objected nor requested a curative instruction.
¶ 18 The jury returned a guilty verdict for first degree murder.

C. Post-Trial
¶ 19 After the jury's verdict, the trial court discovered that, due to a technical error, the audio feed for the courtroom video camera[6] had not been recording for three days of trial. This discovery occurred seven days after the unrecorded testimony.
¶ 20 Acting under RAP 9.4, the parties and the trial court reconstructed the record, using notes and recollections of the clerk, bailiff, both parties, and intermittent footage of courtroom proceedings produced by the news media. The parties signed an Agreed Report of. Proceedings, stating the reconstruction was accurate to the best of each party's recollection, and the trial court signed its approval of the reconstruction. The trial court also recreated a verbatim transcript of one and one-half days using the intermittent footage from the news media. Nonetheless, Classen's counsel filed a declaration stating that, in his opinion, the parties were unable to reconstruct the record sufficiently to satisfy due process.
¶ 21 Classen moved for a new trial based on (1) the trial court's having limited his cross examination of Dr. Ward; (2) the trial *587 court's having allowed testimony about Classen's behavior while in custody; (3) prosecutorial misconduct during closing argument; and (4) insufficiency of the record for appellate review. The trial court denied the motion.
¶ 22 The court sentenced Classen to 280 months in prison.
¶ 23 Classen appeals.

ANALYSIS
I. Sufficiency of Reconstructed Record
¶ 24 Classen argues that the partially reconstructed trial record violates his due process rights because it is insufficiently complete for our appellate review. We disagree.,

A. Standard of Review
¶ 25 A criminal defendant must have a "record of sufficient completeness" for appellate review of potential errors. State v. Larson., 62 Wash.2d 64, 66, 381 P.2d 120 (1963) (citing Draper v. Washington, 372 U.S. 487, 495-96, 83 S.Ct. 774, 9 L.Ed.2d 899 (1963)). But a "complete verbatim transcript" is not required. State v. Tilton, 149 Wash.2d 775, 781, 72 P.3d 735 (2003) (quoting Mayer v. City of Chicago, 404 U.S. 189, 194, 92 S.Ct. 410, 414, 30 L.Ed.2d 372 (1971)).
¶ 26 Nevertheless, an alternative method must allow counsel to determine which issues to raise on appeal and to "place before the appellate court an equivalent report of the events at trial from which the appellant's contentions arise." State v. Jackson, 87 Wash.2d 562, 565, 554 P.2d 1347 (1976) (quoting Draper, 372 U.S. at 495, 83 S.Ct. 774). If the reconstructed record fails to recount events material to issues on appeal satisfactorily, the appellate court must order a new trial. Tilton, 149 Wash.2d at 783, 72 P.3d 735. But such is not the case here.

B. Reconstructed Record
¶ 27 RAP 9.4 provides:
[P]arties may, prepare and sign an agreed report of proceedings setting forth only so many of the facts averred and proved or sought to be proved as are essential to the decision of the issues presented for review. The agreed report of proceedings must include only matters which were actually before the trial court . . . agreed report of proceedings may be prepared if either the court reporter's notes or the videotape of the proceeding being reviewed are lost or damaged.
Case law varies in holding reconstructed records insufficient or sufficient for appellate review, largely depending on the particular circumstances of the individual cases. We must decide toward which end of the spectrum Classen's case falls.

1. Insufficient
¶ 28 We first examine the cases in which the reconstructed record was held insufficient for appellate review. In Larson, 62 Wash.2d at 64, 381 P.2d 120, our Supreme Court held a reconstructed record insufficient where (1) a reporter's notes for the entire trial were lost and the trial court provided its own narrative instead, Id. at 65, 381 P.2d 120; and (2) the defendant had new counsel on appeal and, thus, because he had not been trial counsel, he could not appraise the sufficiency of the record. Under these circumstances, the Court found a violation of due process arid ordered a new trial. Id. at 67, 381 P.2d 120.
¶ 29 In Tilton, 149 Wash.2d at 783, 72 P.3d 735, the Court also held a reconstructed record insufficient and reversed where (1) the trial court's tape recorder was accidentally left off during the defendant's testimony, Id. at 779, 72 P.3d 735; (2) his trial lawyer had no independent memory or notes of the defendant's testimony; and (3) the defendant's unrecorded testimony was essential to his appeal based on ineffective assistance of trial counsel. Id. at 783, 72 P.3d 735. Despite its holding under the specific facts of this case, the Supreme Court generally noted that a new trial will seldom be required when a report of proceedings is not recorded or where it has been lost. Id.

2. Sufficient
¶ 30 We next examine the cases in which the reconstructed record was held sufficient. *588 In State v. Putman, 65 Wash.App. 606, 829 P.2d 787 (1992), review denied, 122 Wash.2d 1015, 863 P.2d 73 (1993), we held that a reconstructed record was sufficient for appellate review where (1) the trial court failed to record a suppression hearing where the court found the murder weapon admissible; and (2) the appellate court could review a Stateprepared narrative report of proceedings from its contemporaneous notes, the court's written findings of fact and law, and the verbatim report of the trial court's ruling on the motion to suppress. Putman, 65 Wash. App. at 610, 829 P.2d 787.
¶ 31 In State v. Miller, 40 Wash.App. 483, 698 P.2d 1123 (1985), review denied, 122 Wash.2d 1015, 863 P.2d 73 (1993), the defendant argued that the trial record was insufficient for review because it omitted the court's response to a jury inquiry during deliberations. Id. at 486, 698 P.2d 1123. Division One of our court noted that where possible, the trial court should try to recreate an adequate narrative using available resources, including third parties. Id. at 487-88, 698 P.2d 1123 (quoting Glaser v. Holdorf, 53 Wash.2d 92, 94, 330 P.2d 1066 (1958)). Noting, however, that Miller had failed to show any prejudice resulting from the omitted portion of the record, Division One affirmed his conviction. Miller, 40 Wash.App. at 489, 698 P.2d 1123.

3. Classen's reconstructed record
¶ 32 Read together, the pertinent holdings largely depend on such factors as (1) whether all or only part of the trial record is missing or reconstructed, (2) the importance of the missing portion to review the, issues raised on appeal, (3) the adequacy of the reconstructed record to permit appellate review, and (4) the degree of resultant prejudice from the missing or reconstructed record, if any, to the defendant. These factors place Classen's case at the sufficiency end of the reconstructed record spectrum.
¶ 33 Here, the record is not inadequate for our appellate review as was the case in Larson and Tilton, where the report of proceedings for the entire trial or of testimony vital to an issue on appeal was missing or lost. Larson, 62 Wash.2d at 65, 381 P.2d 120; Tilton, 149 Wash.2d at 783, 72 P.3d 735. Rather, Classen's case is more like Putman and Miller.
¶ 34 Here, there was a verbatim report of proceedings for most the 16-day trial.[7] Missing were only three days of audio recording of the State's rebuttal case, one and one-half days of which the parties and the trial court were able to reconstruct from news media video footage. This video footage exhibited a high degree of reliability and, according to the trial court, was of higher quality than the court's own recordings. In addition, under the trial court's direction, the parties were able to reconstruct the remainder of the missing record[8] from the attorneys' notes and memories one week after the testimony, which also exhibited a high degree of reliability.
¶ 35 Both parties signed the resultant Agreed Report of Proceedings under RAP 9.4, attesting that the reconstructed record was accurate "to the best of [their] knowledge." Although Classen's trial counsel also declared he could not certify the reconstruction was accurate and complete, on appeal he fails to specify any material facts that the reconstructed record omitted or how the record diminishes his ability to raise, and our ability to consider, his issues on appeal. Thus, Classen has demonstrated no prejudice as a result of the reconstructed narrative report of proceedings.
¶ 36 We hold that the record, including the reconstructed portions, adequately represents the facts material to the issues on appeal and that it is sufficiently complete for our appellate review. Accordingly, we decline to reverse on this ground.
*589 II. Restriction of Impeachment Testimony
¶ 37 Classen next argues that the trial court erred by restricting his cross examination of Dr. Ward about his alleged statement to Maurice that second degree was about the appropriate degree of murder to charge and by excluding Maurice's proposed impeachment of Dr. Ward on this point. Again, we disagree.

A. Standard of Review
¶ 38 The right to cross-examine adverse witnesses is not absolute. Chambers v. Mississippi, 410 U.S. 284, 295, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973). A trial court may, in its discretion, reject cross-examination where the circumstances only remotely tend to show bias or prejudice of the witness, where the evidence is vague, or where the evidence is merely argumentative and speculative. State v. Knapp, 14 Wash.App. 101, 107-08, 540 P.2d 898 (1975); see also State v. Roberts, 25 Wash.App. 830, 611 P.2d 1297 (1980). We review a trial court's limitation of cross examination for manifest abuse of discretion. State v. Campbell, 103 Wash.2d 1, 20, 691 P.2d 929 (1984), cert. denied, 471 U.S. 1094, 105 &Ct. 2169, 85 L.Ed.2d 526 (1985). We find no such abuse here.

B. Limitation of Cross Examination
¶ 39 Generally, an out-of-court statement offered for the truth of the matter asserted is inadmissible hearsay. ER 801; ER 802. Nonetheless, a witness's prior out-of-court inconsistent statement may be admissible for impeachment, ER 613(b), to allow the trier of fact to compare "something the witness said out of court with a statement the witness made on the stand" in order to ascertain the witness's credibility. State v. Spencer, 111 Wash.App. 401, 409, 45 P.3d 209 (2002).
¶ 40 Here, both before and during trial, Classen made an offer of proof that Maurice Classen would testify that State rebuttal witness Dr. Ward had told him that a second degree murder charge would be more appropriate for Classen than first degree murder. The trial court ruled that (1) the admissibility of Maurice's testimony depended on Dr. Ward's testifying about the degree of murder he personally believed the State ought to have charged; (2) such opinion would improperly invade the province of the jury, regardless of whether Dr. Ward opined that first or second degree murder was the more appropriate charge;[9] (3) therefore, Dr. Ward could not tell the jury his opinion about the appropriate degree of murder that the State should have charged; and (4) Classen could not attempt to impeach Dr. Ward with Maurice's hearsay testimony about Dr. Ward's allegedly prior inconsistent statement that second degree murder was the appropriate charge.[10]
¶ 41 Accordingly, we hold that Classen has failed to show that the trial court's exclusion of Maurice's testimony as hearsay was a manifest abuse of discretion.

C. Confrontation Clause
¶ 42 In a related argument, Classen contends that the trial court's limitation of Dr. Ward's cross examination violated his Sixth Amendment confrontation rights. This argument fails.
¶ 43 Article I, Section 22 of the. Washington Constitution guarantees a criminal defendant the right to confront and cross-examine witnesses against him. Wash. Const. Art. I, § 22; State v. McDaniel, 83 Wash.App. 179, 185, 920 P.2d 1218 (1996), review denied, 131 Wash.2d 1011, 932 P.2d 1255 (1997). But there is no constitutional right to admit irrelevant or otherwise inadmissible evidence. *590 State v. Darden, 145 Wash.2d 612, 624, 41 P.3d 1189 (2002) (citing State v. Hudlow, 99 Wash.2d 1, 15, 659 P.2d 514 (1983)), and Davis v. Washington, 547 U.S. 813, 126 S.Ct. 2266, 2273-74, 165 L.Ed.2d 224 (2006), respectively.
¶ 44 Furthermore, when Dr. Ward testified as a rebuttal witness for the State, he was available for cross examination by Classen, subject only to the trial court's exclusion of his alleged statement to Maurice. The trial court properly excluded Dr. Ward's hearsay statement to Maurice about the appropriate degree of murder as inadmissible opinion evidence, which would have invaded the jury's province.[11] We hold, therefore, that because the excluded evidence was inadmissible, Classen had no Sixth Amendment right to introduce it.
III. Behavior During Pretrial Custody
¶ 45 Classen next argues the trial court erred and violated his right to a fair trial when it admitted testimony about his behavior during pretrial custody. The State counters that in so ruling, the trial court properly balanced the testimony's probative value and any prejudicial effect and, therefore, did not abuse its discretion. We agree with the State.

A. Standard of Review
¶ 46 The trial court exercises broad discretion to determine admissibility of evidence, balancing its probative value against its potential prejudicial effect. ER 403. We review the trial court's admission of evidence for abuse of discretion. State v. Pirtle, 127 Wash.2d 628, 648, 904 P.2d 245 (1995), cert. denied, 518 U.S. 1026, 116 S.Ct. 2568, 135 L.Ed.2d 1084 (1996). We find no such abuse here.

B. Right to Fair Trial
¶ 47 The Washington Constitution guarantees criminal defendants a fair and impartial trial. Wash. Const. Art. I, § 3 and 22. Inherent in this right is the presumption of innocence, including the right to "the appearance, dignity, and self-respect of a free and innocent man." State v. Finch, 137 Wash.2d 792, 844, 975 P.2d 967, cert. denied, 528 U.S. 922, 120 S.Ct. 285, 145 L.Ed.2d 239 (1999) (right to fair trial violated when defendant appeared before jury in physical restraints).
¶ 48 Classen cites State v. Gonzalez, 129 Wash.App. 895, 120 P.3d 645 (2005), in which before the defendant was brought into court, the trial court announced to the jury that Gonzalez was in custody throughout trial and that he might be physically restrained and under guard in court. Id. at 898, 120 P.3d 645. Even though Gonzalez was not actually restrained in the jury's presence during trial, Division Three of our court reversed and remanded for a new trial, holding that "the key concern is the jury's awareness, by whatever means conveyed." Id. at 902, 905, 120 P.3d 645.
¶ 49 In contrast, Division One of our court rejected a defendant's argument that testimony about his in-custody conversations unconstitutionally violated his right to fair trial by implicating his custodial status. State v. Mullin-Coston, 115 Wash.App. 679, 692, 64 P.3d 40 (2003). The court held that (1) although testimony referencing custody may "carry some prejudice, [it does] not carry the same suggestive quality of a defendant shackled to his chair during trial"; and (2) a "reasonable juror would know that a defendant *591 in a first degree murder trial was not likely to be released pending trial regardless of whether he was later found to be innocent." Mullin-Coston, 115 Wash.App. at 693, 64 P.3d 40. The court considered the defendant's constitutional argument but ultimately concluded that the issue was evidentiary, not constitutional, in nature. Mullin-Coston, 115 Wash.App. at 692-95, 64 P.3d 40.
¶ 50 The facts here are readily distinguishable from those in Gonzalez and are more like those in Mullin-Coston. Here, the trial court made no special advance announcement drawing attention to Classen's incarcerated status. Nor did Classen ever appear in shackles in front of the jury. Thus, the jury had no actual or imagined mental picture of Classen as so dangerous that he had to be shackled.
¶ 51 Here, as in Mullin-Coston, we consider Classen's constitutional argument but conclude that the issue is evidentiary in nature. Here, as in Mullin-Coston, the trial court balanced the probative value against the possible prejudicial effect and found in favor of admitting the evidence. Three experts testified that Classen's behavior during his pretrial time in custody was an important collateral source to determine whether Classen had bipolar disorder; the probative value of the testimony was very high and particularly relevant to his capacity to form the requisite mental intent to commit first degree murder. We note here, as did our colleagues in Mullin-Coston, that (1) a reasonable juror likely knows that a defendant charged with first degree murder is kept in custody, and (2) the guards' testimonies did not give rise to the same prejudicial effect as a defendant's appearance under physical restraint in view of a jury.
¶ 52 Given the high probative value of the testimony relative to the slight likelihood of its prejudicial effect, we hold that the trial court did not abuse its discretion by admitting testimony about Classen's pretrial behavior while in custody.[12]

IV. Prosecutorial Misconduct
¶ 53 Finally, Classen argues that the prosecutor committed misconduct by allegedly misstating the law in closing when he argued to the jury that "manslaughter is an accident" and this killing was no accident. The State counters that any misstatement of the law was not so ill-intentioned and flagrant that a curative instruction could not have cured the error if Classen had timely objected, which he failed to do. We hold that any error, was harmless.

A. Standard of Review
¶ 54 Classen neither objected during the prosecutor's closing argument nor requested a curative instruction. Instead, he raised the issue for the first time after the jury's verdict, during his motion for a new trial.
¶ 55 Generally, in order to preserve error for review, counsel must call the ,alleged error to the court's attention at a time when the error can be corrected. State v. Fagalde, 85 Wash.2d 730, 731, 539 P.2d 86 (1975). Failure to object to an improper comment constitutes waiver of error unless the comment is so flagrant and ill-intentioned that a curative instruction could not have obviated the resulting prejudice. State v. Russell 125 Wash.2d 24, 86, 882 P.2d 747 (1994). We review a prosecutor's alleged misconduct "in the context of the total argument, the issues in the case, the evidence addressed in the argument, and the instructions given to the jury." State v. Brown, 182 Wash.2d 529, 561, 940 P.2d 546 (1997) (citing Russell 125 Wash.2d at 85-86, 882 P.2d 747).

B. Closing Argument
¶ 56 Classen relies on State v. Davenport, 100 Wash.2d 757, 675 P.2d 1213 (1984), in which the jury returned a guilty verdict following a prosecutor's misstatement of the law about accomplice liability. Davenport, 100 Wash.2d at 758-59, 675 P.2d 1213. Although defense counsel objected immediately, *592 properly preserving the issue for appeal, the trial court overruled the objection. Davenport, 100 Wash.2d at 758-59, 675 P.2d 1213. During deliberations, the jury requested a legal definition of "accomplice." Davenport, 100 Wash.2d at 764, 675 P.2d 1213. Ultimately overturning the conviction, our Supreme Court held that because the record "clearly supports the conclusion that the jury had considered the improper statement during deliberation," the error was not harmless. Davenport, 100 Wash.2d at 764, 675 P.2d 1213.
¶ 57 Here, unlike in Davenport, Classen waived this issue for appeal when he failed to object at the first opportunity after the prosecutor made the improper argument during closing. Even assuming, without deciding, that the prosecutor's misstatement of law was misconduct, it was not so flagrant and illintentioned that a curative instruction could not have remedied its prejudicial effect. Having failed to preserve this issue in a timely fashion, Classen cannot now raise this issue on appeal. Therefore we do not further consider it.[13]
¶ 58 Affirmed.
I concur: ARMSTRONG, J.
QUINNBRINTNALL, J. (dissenting).
¶ 59 One morning in February 2005, Dr. James Classen stabbed his estranged wife, Eveann, about 100 times with a pair of sewing scissors. Thereafter, the State charged Classen with first degree premeditated murder. Classen admitted to stabbing Eveann, but he argued that because he suffered from bi-polar disorder, a recognized mental disease or defect, his mental condition reduced his criminal culpability from premeditated first degree murder to manslaughter. After a 17-day trial, the jury found Classen guilty of first degree premeditated murder.
¶ 60 Classen claims three errors deprived him of a fair trial: (1) the trial court refused to allow him to fully cross-examine Dr. Barry Ward, who testified that Classen did not suffer from bi-polar disorder and had the requisite mental capacity to commit first degree murder, (2) the trial court improperly allowed jail personnel to relate Classen's behavior during the 14 months he was incarcerated awaiting trial, and (3) during closing argument, the deputy prosecutor misrepresented the law by improperly characterizing manslaughter as an accidental crime. While I agree with the majority that the record is sufficient to allow Classen to raise these issues, I believe the record is insufficient to conclude that any error was harmless. Accordingly, I respectfully dissent.
¶ 61 First, the record does not allow a full and fair review of whether the trial court erred when it limited Classen's cross-examination of Dr. Ward. Classen's defense counsel sought to impeach Ward's rebuttal testimony with inconsistent statements he allegedly made to Classen's son, Maurice, a deputy prosecutor in another county. In response to the State's motion in limine to exclude the alleged statements, Classen's defense counsel explained,
What I believe [Ward] said to Maurice Classen runs contrary to the opinions he's gonna offer this jury, where he said he believes this is more appropriately a murder two, which in shorthand is his way of telling someone that he thinks there's grave questions about whether he had the capacity to premeditate.
7-A Report of Proceedings (RP) at 609 (emphasis added). Classen's counsel further argued, "[F]or [Ward] to say it's more appropriately Murder in the Second Degree is his way of saying that I believe that there's serious questions about his ability to premeditate. That's the only thing he could have meant in context." 7-A RP at 611 (emphasis *593 added). Unable to determine whether Dr. Ward was stating his opinion regarding an appropriate charging policy or, as defense counsel contended, using shorthand with regard to Classen's mental state, the trial court reserved its ruling on admissibility until it could review the phrasing of the parties' questions and the witnesses' answers at trial.[14]
¶ 62 Unfortunately, the record as presented does not facilitate a review of the trial court's ruling with respect to the admissibility of the alleged statements. A significant portion of Dr. Ward's testimony, including the State's direct examination, is missing. While a partial, reconstructed record did include a portion of the defense offer of proof, Ward both denied making the "murder two" statement to Maurice Classen and acknowledged that, from such a statement, one could infer the speaker questioned the defendant's capacity to premeditate.[15]
¶ 63 Although parties may agree to present a narrative report of the trial proceedings sufficient to permit appellate review in lieu of a transcript,[16] there is little precedent supporting the idea that the court may direct them to do so. Moreover, the parties did not agree here. Classen's defense counsel clearly stated that, despite their best efforts, they could not attest to the accuracy or completeness of the narrative report. Given that the trial court was unable to resolve the critical issue of the intended meaning of Dr. Ward's "murder two" reference without reviewing the phrasing of the parties' questions and the witnesses' answers, and given that the portions of the record on this critical issue do not contain this necessary information, I cannot say that the record is sufficiently complete to establish that Ward was making a charging policy comment and not speaking in shorthand as Classen's defense counsel argued. Ward denied making the statement, but he acknowledged that such a statement, if made, called into question the elements of first degree murder and, in this context, the particular element of premeditation. Accordingly, the record is insufficient to allow a full and fair review of this issue and insufficient for me to confidently declare that Classen received a fair trial.[17]
¶ 64 Second, although I agree with the majority that the jail guards' testimony regarding Classen's behavior while in custody pending trial is relevant evidence, presenting this evidence could be more prejudicial than probative if the questioners or the witnesses placed undue emphasis on the fact that they observed Classen's behavior while he was in custody, unable to make bail and awaiting trial. This area of inquiry is a particularly delicate one and the trial court must carefully examine the precise phrasing of questions and, answers. Unfortunately, the verbatim record did not preserve the jail guards' testimony for review.
*594 ¶ 65 Additionally, the narrative report of proceedings demonstrates that the witnesses placed significant emphasis on the jail setting:
The State called Chris Anderson on April 19, 2006. This witness testified from 5:03 pm to 5:14 pm. Mr. Anderson testified to the following:
Mr. Anderson is employed as a custody officer in the Clark County jail. Anderson was the officer assigned to the jail pod in which [Classen] was housed for ten months in the year 2005. Officer Anderson worked a day shift in the jail during that time. Each day during the ten month period Anderson was assigned to the pod in which [Classen] was housed, [Classen] entered the day room from 8:00AM to 11:30AM. When [Classen] was in the day room, there were generally nine inmates in the day room including [Classen]. When [Classen] was in the day room, he was twelve to fourteen feet away from Anderson. Anderson could hear [Classen] speak if Anderson keyed his microphone in his area. Anderson keyed his microphone often. Anderson's desk faces the day room area. When [Classen] was not in the day room, Anderson could not see [Classen] any better than he could see the other inmates in the pod. Inmates are housed in cells 360 degrees around Anderson's desk. Anderson never observed [Classen] acting out, having problems with other inmates, or having any type of behavioral problems of any sort during the ten month period he was in the same pod with [Classen].
2 Clerk's Papers (CP) at 234-35.
The State called Mr. Ashworth on April 19, 2006. Mr. Ashworth testified from 5:14PM to 5:19PM. Mr. Ashworth testified to the following:
Mr. Ashworth is employed as a custody officer at the Clark County Jail. When [Classen] was initially incarcerated after his arrest in this case, he was placed in suicide watch at the jail. [Classen] remained in the suicide watch area for less than one week. Mr. Ashworth was one of the guards in the suicide watch area for two of the days that [Classen] was in the suicide watch area. There were a total of eight inmates in the suicide watch area when Ashworth was in that part of the jail with [Classen]. Ashworth's job was to watch the eight inmates closely during that time. Ashworth worked twelve hour shifts for the two days he was in the suicide watch area with [Classen]. Ashworth did not observe [Classen] exhibit any type of behavioral problems of any sort during the time he observed [Classen] in the suicide watch area of the jail.
Mr. Ashworth was assigned to the pod in the jail where [Classen] was housed for the last month prior to the trial in this matter. This is the same pod officer Anderson was assigned to for ten months in the year 2005. Ashworth did not observe [Classen] have any type of behavioral problems while he was assigned to the pod in which [Classen] was housed.
2 CP 235-36.
The State called Victoria McKenzie on April 19, 2006. Ms. McKenzie testified from 5:20PM to 5:22 PM. Ms. McKenzie testified to the following:
Mrs. McKenzie is a sergeant in the Clark County jail. Sergeant McKenzie explained inmates receive infractions in the jail if they have behavior problems. She stated inmates receive minor infractions for behavior such as saving food at meals or not making their beds, and they receive major infractions for behavior such as fighting. Sergeant McKenzie testified that during the fourteen months [Classen] was in custody pending trial in this matter, he received no infractions.
2 CP 236.
¶ 66 I agree that Sergeant McKenzie's, as well as other jail guards', personal observations of Classen's behavior and interactions during the preceding 14 months may have been relevant evidence of his state of mind. But it appears that McKenzie was testifying to jail infraction records as if under the business records exception to the hearsay rule.[18] I question the relevance of such lack of infraction testimony. ER 401. Even if *595 relevant, the agreed report of proceedings does not contain sufficient foundation to establish admissibility under the business records exception to the hearsay rule. See chapter 5.45 RCW; see also State v. Hopkins, 134 Wash.App. 780, 789, 142 P.3d 1104 (2006), review denied, 160 Wash.2d 1020, 163 P.3d 793 (2007) (holding the State is not excused from establishing the prerequisites for the business records exception to apply).
¶ 67 Here, we have only an uncorroborated narrative report of proceedings that Classen's defense counsel was unable to attest is sufficiently accurate or complete. Based on this deficient record, I cannot say that the jail guards' testimony did not unduly emphasize the prejudicial fact of Classen's incarceration. To the contrary, in my opinion, Sergeant McKenzie's testimony was based entirely on the fact of his incarceration and, thus, was improper.
¶ 68 Third, although I disagree with the majority's analysis regarding the deputy prosecutor's characterization of manslaughter as an accident, I do agree that defense. counsel's failure to object may preclude appellate review. See State v. Boehning, 127 Wash.App. 511, 518, 111 P.3d 899 (2005). But in light of the nature of Classen's defense, I believe that characterizing manslaughter as an accident is misleading and improper. A defendant who claims that he did not intentionally do an act that resulted in the death of another may be arguing he acted negligently or recklessly and without intent to kill. In such circumstances, referring to manslaughter as an unintentional or accidental killing is neither misleading nor improper. But the analysis differs where, as here, a defendant claims that his physical conduct may have been intentional (stabbing 100 times), but that he lacked the capacity to act intentionally or premeditate an intent to kill because he suffers from a mental disease or defect. In such cases, the law directs that a jury may find him guilty of a lesser charge. See State v. Bottrell, 103 Wash.App. 706, 712, 14 P.3d 164 (2000), review denied, 143 Wash.2d 1020, 25 P.3d 1019 (2001); 11 Washington Practice: Washington Pattern Jury Instructions: Criminal 18.20, at 224 (2d ed.1994). When the defendant raises a legal defense of diminished capacity, it is misleading for a deputy prosecutor to argue to the jury that it must be able to characterize the victim's death as an accident in order to find that the defendant committed only the lesser charge of manslaughter. Because that is the gist of the deputy prosecutor's argument, believe it was improper.
¶ 69 Because the record in this case is insufficient to analyze fully the errors alleged and their impact on the jury's verdict, in my view due process requires that Classen receive a new trial. Therefore, I respectfully dissent.

APPENDIX
Many parts of the record in this case (and many other cases in which transcripts are prepared from electronically recorded proceedings) are less than satisfactory. Sometimes defective microphones cause the deficiencies:
The Court: Second item is the problem with the microphone at counsel table, at the Defense microphone. I've asked the attorneys to speak up. I've just left our court administrator's office and he assures me that JAVS will be here at noon and hopefully will solve our problem for us.
I am monitoring from up here the sound levels, as is Rhonda back in chambers area. That's my judicial assistant. We will inform you if there is a problem. Or we'll do our best to inform you if there's a problem. I just remind you if you could speak up. Certainly if you wish to approach theto get to another microphone or you haveare at liberty to do that.
6 RP 383-84. The record here also contains discussions about the microphone not picking up defense counsel, who practices in a county where the courts use live reporters and is accustomed to being told when he cannot be heard.
In addition, deficiencies occurred because background noise interferes with the recording:
The Court: (Pause; reviewing exhibits.)
[Defense Counsel]: (Counsel making inaudible comments while the Court is flipping photographs against microphone) *596 we're not objecting, Your Honor, to the hand photos
4 RP 249. And, most frequently, by the court and parties rudely talking over one another at the same time.
The Court: Is that what you're gonna offer, a statement of that type, where the doctor passes judgment on the law?
[Defense Counsel]: Your Honor, that's a trickyII have to tell you that's a tricky piece. Ithe fact is it's kind of unique, fact pattern. You know, Dr. Ward presented his opinion, his expert opinion that therethatthat Dr. Classen had the capacity to do both.
And then while interviewing Maurice Classen for histo finish his evaluation, and Maurice was at his desk taking notes at the time, you know, he basically makes a statement that would certainly sound like he really doesn't think that Dr. Classen would have the capacity to premeditate.
And that's the essence of what he's saying if he's saying it should have been a murder two and not a murder one.
So I think that the
The Court: Is that what heis that the verbiage that he's supposed to have said, it should have
[Defense Counsel]: Essentially that is The Court:been (inaudible).
[Defense Counsel]:what he said, Your Honor.
The Court: Well, I'm gonnaI'm gonna give you a knee-jerk reaction, gentlemen. I'm gonna let you brief it, okay, I'm gonna let you both brief it.
My first reaction is, okay, what's his expertise to pass judgment on a legal?
[Defense Counsel]: Your Honor
The Court: Okay?
[Defense Counsel]:it was aI apologize to the Court. Matter of fact, Mr. Maybrown just hit me and sort of reminded me. I just didn't get a chance.
The Court: That's right, he was a lawyer, wasn't he?
[Defense Counsel]: Nine years.
The Court: Okay.
[Defense Counsel]: And
The Court: Second problem.
[Defense Counsel]: Yep.
The Court: Passing on
[Defense Counsel]: Yep.
The Court:the ultimate conclusion, which is the question for the jury. I'm just giving you a heads-up of one, of those things
[Defense Counsel]: (Inaudible.)
The Court:that my knee-jerk reaction is telling me, there's something a little uncomfortable there, and I'm giving you that out of the box, you're gonna have to work on briefing to convince me
[Prosecutor]: I could call lawyers that would say it's a first degree.
[Defense Counsel]: Your Honor
The Court: I don't want to get into that. [Prosecutor]: So just what I'm saying, it's
The Court: I don't want to
[Prosecutor]:(inaudible; voices overlapping)a question of law
The Court: Yeah.
[Prosecutor]:(inaudible) for a witness.
[Defense Counsel]: Your Honor, the tricky part of this is, II justjust, again, to mention to the Court and for [the prosecutor's] benefit, I guess, for the purposes of briefing, is that, you know, the suggestion here would not be that it is, you know, that he's making a statement which was is within the obvious realm ofof the jury conclusion, but rather that he's making a a statement based on his role as the evaluating psychologist.
The Court: It's the use of the phrase murder one and murder two.
[Defense Counsel]: It's the capacity to
The Court: Which
[Defense Counsel]:premeditate. That's the tricky part.
The Court: Well, if you keep your questioning within bounds of what his profession is now
[Defense Counsel]: Right, right. Right.
The Court:okay and
[Defense Counsel]: Right.

*597 The Court:why he reached the conclusions he reached, that's fine, because you if you're offering that to impeach, what are you impeaching? Okay. You're impeaching the State's case, not a witness, okay, and you're asking for an ultimate conclusion. Those are the two problems [sic] areas I see coming out of the box.
And I'm just pointing out what I see [Defense Counsel]: I understand
The Court:not ruling, I'm just saying those are the things I See as potential problems with the Defense raising this issue.
I would prefer to have it briefed.
[Defense Counsel]: Oh, it will, Your Honor, and I think that was
The Court: (Inaudible; voices overlapping.)
[Defense Counsel]:(inaudible; voices overlapping)
The Court: And, Mr. Maybrown, it is my custom and practice to give heads-up. This is what. I'm thinking knee-jerk, now go convince me of something else. Okay. I did it to you once already, and now this is the second time, I just want to do it make sure you were clear on that.
3 RP 195-200.
These deficiencies make transcripts of the electronically recorded proceedings difficult to read. This author sometimes must, color code the speakers in order to complete the speaker's intended sentence. The overlapping voices also increase the litigant's transcription costs by increasing the number of pages transcribed. Each time a new voice enters the fray, the reporter transcribes a new line, even if it is only to add a single word or to indicate that the record is inaudible at that point.
NOTES
[1] We use the first names of some parties and witnesses to avoid confusion. We intend no disrespect.
[2] Miranda v. Arizona, 384, U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
[3] The trial court later held a CrR 3.5 hearing, found that Classen had knowingly and voluntarily waived his constitutional rights, and admitted the videotaped statement into evidence. The admissibility of this confession is not an issue on appeal.
[4] The State did not call Drs. Ward or Karnik in its case in chief.
[5] We note that in n. 11 on page 19 of his Brief of Appellant, Classen characterizes his offer of proof as follows: "Maurice Classen would have testified that Dr. Ward had told him that he (Ward) did not really think Dr. Classen would have the capacity to premeditate." Contrary to Classen's assertion, record consistently shows that Classen's offer of proof was limited to Dr. Ward's alleged statement to Maurice that second degree murder was the more appropriate charge: Defense counsel told the trial court, "Maurice . . . indicated to me that Dr. Ward, told him he thought this case should be a murder two instead of a murder one." RP at 195. Trial court asked if "murder two and not a murder one" was "the verbiage that he's supposed to have said"; to which defense counsel replied, "[E]ssentially that is [what he said.]". RP at 196.
[6] Clark County Superior Court uses a video camera to record its trial proceedings instead of a court reporter.
[7] The portion of this trial during which the parties presented evidence to the jury, however, was six days in length.
[8] The court was able to recreate verbatim transcripts for portions of Dr. Ward's testimony, and the attorneys' entire closing arguments from the news media footage. The parties reconstructed the testimony of Dr. Karnik and the three custodial officers.
[9] See ER 704. See also State v. Demery, 144 Wash.2d 753, 759, 30 P.3d 1278 (2001) (citing City of Seattle v. Heatley, 70 Wash.App. 573, 579, 854 P.2d 658 (1993)) (to determine whether statement is impermissible opinion testimony, the court will generally consider the circumstances of the case, including: type of witness, nature of the testimony and charges, type of defense, and other evidence presented).
[10] Dr. Ward did not specifically testify about Classen's mental capacity to commit first degree murder, much less about the actual degree of the crime. Instead, as discussed above, Dr. Ward testified that Classen (1) suffered from major depressive disorder, (2) had the capacity to engage in "goal-directed behavior," and (3) could "reflect before purposeful action." RP at 836-38.
[11] Because we affirm the trial court's exclusion of Maruice's testimony as hearsay and improper opinion evidence, we do, not address Classen's additional argument that the Sixth Amendment required allowance of Maurice's testimony under Chambers, 410 U.S. 284, 93 S.Ct. 1038, or that it was non-testimonial, and somehow thereby admissible, under Davis v. Washington, 547 U.S. 813, 126 S.Ct. 2266, 2273-74, 165 L.Ed.2d 224 (2006), and State v. Mason, 160 Wash.2d 910, 918, 162 P.3d 396, 400-01 (2007).

We further note that even if the trial court's preventing cross examination of Dr. Ward about his "alleged opinion that second degree murder was the appropriate charge implicated Classen's Sixth Amendment confrontation rights, any error was harmless. Mason, 160 Wash.2d at 928, 162 P.3d 396 (citing State v. Davis, 154 Wash.2d 291, 304, 111 P.3d 844 (2005)); State v. Powell, 126 Wash.2d 244, 267, 893 P.2d 615 (1995). Also, testifying on rebuttal, about the symptoms of bipolar disorder and the effects the illness would have on a person in custody, Dr. Karnik corroborated Dr. Ward's rebuttal testimony.
[12] Although we agree with the dissent that reviewing this issue might have been easier if we had the missing verbatim report of proceedings, instead of the reconstructed version, we cannot say that the lack of such verbatim report rises to the level of preventing meaningful appellate review. Nor has Classen alleged or demonstrated specific prejudice flowing from the reconstructed record, in which his trial counsel participated.
[13] We note, however, that the trial court properly instructed the jury on the definition of manslaughter as a lesser included offense of murder. Jurors are presumed to follow the court's instructions. State v. Daniels, 160 Wash.2d 256, 264, 156 P.3d 905 (2007) (citing State v. Stein, 144 Wash.2d 236, 247, 27 P.3d 184 (1000). Moreover, there is no evidence that the jury considered the prosecutor's allegedly improper "manslaughter" remark during its deliberations. In light of the entire proceeding, Classen has not shown likely prejudice from the prosecutor's closing argument. Thus, even were we to consider the substance of Classen's argument, any error was harmless.
[14] The trial court explained its reasoning as follows:

The Court: I'll give you initial reaction, gentlemen, without argument, is that a lot of these questions will turn on the manner in which you ask witnesses questions.
For instance, Mr. Maybrown, when you're talking about Dr. Ward, you know, if Dr. Ward offers an opinion about the state of mind of the defendant which in some way is contrary to aa lesser included, murder one, murder two, that might be `something that you could probe on cross-examination.
But to come out as a straight-up impeachment that you reached this conclusion but you said this other thing on a legal conclusion, I think you're gonna be a little bit tougher on that road.
So problem I'm facing is a lot of the questions that you have raised with me in these motions really will turn on how youyou do direct and cross-examination of these various witnesses.
7-A RP at 605-06.
[15] Classen's defense counsel asked Dr. Ward, "During the course of that conversation, do you recall telling Maurice Classen that the more appropriate charge in this case was murder two rather than murder one?" 9-B RP at 842. Ward answered, "I do not." 9-B RP at 842. Again, Classen's defense counsel asked Ward, "Okay, So hypothetically if, in fact, it was reported that you said that, the meaning would be that a question about the capacity to premeditate; true?" 9-B RP at 844. Ward answered, "I you could infer that." 9-B RP at 844.
[16] See RAP 9.3 and 9.4.
[17] Although the technological failure of the recording equipment is by far the greatest impediment to a record sufficient for review in this case, it is not the only one. See, Appendix, infra.
[18] See ER 803(a)(6) and (7).